Filed 3/19/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S064733 |
| v. | ) | |
| | ) | |
| JOHN CLYDE ABEL, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 95CF1690 |
| _____ | ) | |

A jury convicted defendant John Clyde Abel of the first degree murder of Armando Miller (Pen. Code, § 187, subd. (a)), also finding he had personally used a firearm in the commission of the offense (*id.*, § 12022.5, subd. (a)) and finding true the special circumstance that defendant had committed the murder during the course of a robbery (*id.*, § 190.2, subd. (a)(17)). It imposed a sentence of death. We affirm the judgment.

## I. FACTS

### A. Introduction

Armando Miller's family owned the Alameda Market in the City of Orange. Every Friday morning, Miller or his father withdrew either $10,000 or $20,000 from the Sunwest Bank in Tustin to provide check-cashing services to the market's customers. On Friday, January 4, 1991, Miller withdrew $20,000. A few moments later, an unidentified man in the bank's parking lot shot Miller once in the head, killing him. The man left, carrying a paper bag. The money was

never recovered.  Defendant was linked to the crime by the descriptions provided by witnesses who saw the man in the parking lot, the witnesses' selection of defendant's photograph out of photographic lineups, one witness's in-court identification of defendant, and a second witness's testimony that a photograph taken of defendant near the time of Miller's death was a photograph of the man she had seen.  In addition, defendant admitted he had been in the market on at least one occasion, and there was evidence he was aware someone from the market typically withdrew large sums from the bank on Fridays.  Further, a woman who had participated in a series of armed robberies with defendant later in 1991 testified defendant had told her about killing Miller and given her the murder weapon.

### B.  Prosecution's Guilt Phase Case

Police responding to reports of the murder found an expended .22-caliber shell casing close to Miller's body, but little other physical evidence.  No one saw the shooting, but several witnesses reported seeing a man with a gun, or a man running from the vicinity of the shooting carrying a paper bag.

Detectives showed witnesses numerous photographs and many photographic lineups of men resembling the description of the gunman, but the witnesses reported that none was of the man they had seen.  Detectives also interviewed Miller's family and showed them photographs, trying to discover if they knew anyone who might have been the killer, but again to no avail.  The investigation was suspended after all leads had been exhausted without bringing the police any closer to identifying the killer.  It was reopened on August 3, 1993, after Police Detective Nasario Solis received an anonymous telephone call from a woman who told him Miller was killed by a man named John Abel, who was then serving a long prison sentence for a series of bank robberies.  Detective Solis

learned that defendant was incarcerated in Folsom State Prison for a number of armed robberies. He obtained defendant's photograph and over the next year attempted to corroborate other information provided by the anonymous caller.

Detective Tom Tarpley picked up the investigation when he rotated into the homicide unit in 1995. In March 1995, he showed witness Bettina Redondo a photographic lineup containing defendant's photograph. Redondo picked defendant's photograph out, saying he was the man she had seen. Tarpley showed the photographic lineup to a second witness, Colleen Heuvelman, who immediately identified defendant as the man she had seen. Tarpley showed the photographic lineup to Miller's mother, America Miller, who reported having seen defendant in the market with James Gano, a regular customer who had also arranged mortgage loans for the business and was aware of the family's practice of obtaining funds on Friday mornings for the check-cashing aspect of the business. Tarpley also contacted Lorraine Ripple, who had been convicted of committing a number of armed robberies with defendant, asking her if she had any information about Miller's murder. Ripple said defendant had told her he killed Miller and had given her the murder weapon.

Linda Pratt, who had been a teller at Sunwest Bank, testified she cashed a $20,000 check for Miller on the morning of his death. A short time later, she heard a popping sound from outside the bank, looked out the window, and saw Miller lying on the ground. She also saw a person wearing a navy blue watchman cap and carrying a bag run away through a gap in the bushes outside the bank.

Bettina Redondo testified she was outside a building next to the bank when she heard what sounded like a gunshot and saw a man standing with his arm extended, holding in his hand a small, smoking gun. The man walked toward her through the bushes. She went back into the building, but watched the man, who passed within approximately 15 feet of her. She looked carefully so she could

3

describe him to the police. He appeared to be in his late 40's or early 50's, was of medium build, and was carrying a brown bag with a holiday design that looked like it was from a grocery store. He wore a dark blue or black watchman cap over his ears and hair, a dark blue windbreaker, and loose trousers. Redondo estimated she observed the man's face for between 20 and 30 seconds. She recalled he was unshaven and had well-defined cheeks and jaw and the beginnings of a mustache.

Redondo related having worked with a police artist to put together a composite picture of the man she had seen, being shown "over a thousand" photographs and selecting a photograph of a man who later was identified as Larry Jones. But after viewing Jones in a live lineup, she realized he was not the gunman. In March 1995, Detective Tarpley showed her another photographic lineup. She picked out defendant's photograph, telling Tarpley "on the record" she was 80 percent certain defendant was the man, but "off the record" she was 100 percent certain he was the man. Redondo explained she had not wanted to be the only person to identify defendant. She did not identify defendant at trial, explaining she was not comfortable because so much time had passed. But she confirmed defendant's photograph was a photograph of the man she had seen.

Colleen Heuvelman testified she was working at the bank on the morning of January 4, 1991, but had to leave early to take care of her son, who was ill. She was acquainted with Miller and chatted with him for a moment on her way out. She left through a door to the parking lot, turned a corner, and nearly ran into a man standing there. Heuvelman got into her car but continued to watch the man while she put the seatbelt on her son and placed her keys in the ignition; she estimated she observed him for well over a minute. She kept watching because it was unusual to see anyone where the man was standing. She described him as a White male, approximately 46 to 48 years old, with high cheek bones, the mustache of a man who had not shaved in three or four days, thin lips, and very

4

dark eyes. He wore a coat and a dark-colored watchman cap. He had a bit of graying hair sticking out from under the cap. When Heuvelman got home, she learned Miller had been shot in the bank's parking lot. She immediately called the police, telling them she thought she might have seen the gunman. The following day, and again about two months later, police showed Heuvelman a number of photographs, but although some resembled the man she had seen, his picture was not among them. In 1995, Detective Tarpley showed her a photographic lineup that contained defendant's photograph. She identified defendant almost immediately. She also identified defendant at trial, stating she was 100 percent certain he was the man in the bank's parking lot on the morning of January 4, 1991.

Lorraine Ripple, who had committed a large number of robberies with defendant, admitted to multiple convictions for robberies committed in 1987 and 1991. She also admitted she had been convicted of assaulting a prison guard, and stated she would be spending the rest of her life in prison. She said she had not been promised anything in return for her testimony and would not benefit from it; to the contrary, she believed her overall situation would be made more difficult. Ripple testified she had known defendant since the early 1960's and had spent time with him on and off over the years. In March 1991, after being released from prison, she lived for a while with Deborah Lankford. During that time, defendant spent five days a week with her. He was married at the time and spent weekends with his wife. Ripple reported that once when they were in bed together defendant told her he had killed someone in Tustin, telling her it was "an easy score, that he had hit a guy inside a bank, coming out. And [the victim] had a business, a little mini store . . . and he cashed checks for a lot of 'wetbacks' . . . ." Ripple testified defendant had given her the gun he used to kill Miller, which she described as a

5

.22-caliber automatic handgun that ejected casings. She later traded it to a Mexican connection for drugs.

Ripple stated defendant always had a mustache in 1991. He had a blue windbreaker and a navy knit watchman cap he wore with the cuff turned up. He used glasses for reading, but did not normally wear them at other times. When shown a June 1991 picture taken of defendant wearing a windbreaker and a watchman cap, Ripple reported it accurately represented defendant's appearance at that time.

Ripple confirmed Detective Tom Tarpley had contacted her in 1995, asking if she had any information about Miller's death. She said she did not tell him anything immediately, but after he had "earned her respect" she told him what she knew, even though she was aware she would receive no benefit for it.

On cross-examination, Ripple agreed that when Detective Tarpley first contacted her he told her defendant had "given her up," but she said she knew it was not true, asserting investigators always said such things to try to play people off against one another. Defense counsel also brought out, apparently in an attempt to suggest Ripple had fabricated stories about defendant, that Ripple told Tarpley defendant had been involved in other murders. Ripple also testified that in early 1991 a lot of guns were "floating around" among her acquaintances, including more than one .22-caliber weapon, several MAC-11 "machine pistols," and an AK-47 assault rifle. They traded or provided guns to one another depending on need. She had seen defendant with two MAC-11's. Defendant gave her the gun he used to kill Miller after she asked for a "hot gun" that she would dispose of after committing a crime. Ripple reaffirmed she traded the gun to a Mexican connection for drugs, adding she later robbed the connection and had a bad habit of robbing connections.

Detective Steven Rubino testified that in October 1991 he was part of a team that had arrested defendant in connection with another offense. Police searching defendant's car found in it a loaded MAC-11 semiautomatic pistol, a loaded .22-caliber pistol, extra ammunition for both weapons, a photograph of James Gano, a pill bottle with Lorraine Ripple's name on it, and two savings passbooks that did not belong to defendant. The .22-caliber pistol was not the weapon used to kill Miller.

### C. Defendant's Guilt Phase Case

Defendant testified on his own behalf. He admitted to "around two dozen" felony convictions, "almost all for robbery," many of which were for armed robbery. He admitted he had committed bank robberies in 1973 and 1981. He admitted to a series of armed robberies in 1991. He also admitted he was serving a state prison sentence of 44 years 8 months, and a federal prison sentence of 53 years 8 months. Defendant admitted he had once gone with James Gano to the Alameda Market. He admitted knowing Lorraine Ripple, but disputed her claim that they had been acquainted since the 1960's, asserting he first met her in March or April 1991, when she was living with his friend, Deborah Lankford. He explained he could not have known Ripple in the 1960's because he was in prison for most of that decade. He denied ever having an intimate relationship with Ripple. He denied telling her he had committed other murders or telling her the Tustin killing was "an easy score." He denied giving Ripple a .22-caliber automatic or any kind of gun. He said she had never told him she had given the gun to a connection, but she did tell him she had robbed her connection three times. Defendant stated he had been paroled in February 1990, after 17 years in prison. He initially worked at a restaurant, but began to work for James Gano in late 1990, after Gano started a mortgage company. He recalled working on a loan

7

for Elaine Tribble, stating he had visited her at her home in Long Beach about a half-dozen times. He thought he might have delivered mortgage documents to her at her home on January 4, 1991, and he testified that after leaving Tribble's home that day he went to Wilmington and then to San Pedro to visit another potential customer. In San Pedro, he used a pay phone to make a collect call to Gano's office. He had been trying to obtain records of the call but understood from his lawyers and investigators that the mortgage company's records for the period from January 3 through February 4, 1991, were missing.

Defendant denied standing outside the Sunwest Bank at 10:30 a.m. on the morning of January 4, 1991, or shooting anyone there. He suggested he could not have been the man in the parking lot because, unlike that man, he wore glasses, stating he wore glasses in prison before his release on parole in 1990 and continued to wear them thereafter.

On cross-examination, defendant admitted he had been out of prison for various periods from 1966 until 1990, sometimes because he had escaped; it thus was possible for him to have become acquainted with Ripple in the 1960's. He also admitted committing armed robberies on 11 occasions during those years. He admitted gambling and using drugs in 1991, but stated he did not start using until February of that year, approximately one month after Miller was killed. He admitted committing approximately 10 robberies with Ripple. He also admitted he and Deborah Lankford had once broken into a residence and robbed the occupants at gunpoint, taking their savings passbooks. He believed the passbooks had been recovered from the trunk of his car when he was arrested in October 1991.

Defendant's friend, Deborah Lankford, testified for the defense. She admitted she was in state prison serving an 11-year term for armed robbery, had committed a number of other felonies, including numerous armed robberies and

8

several bank robberies, and would later be going to federal prison. She said she had known defendant for nearly 20 years, but denied having any romantic or sexual relationship with him. She testified that during 1990 and early 1991, defendant was living in Fullerton, near a restaurant where he worked. His wife-to-be, Vicki, joined him on the weekends. Lankford provided an alibi for defendant, asserting he had been at her house every day in early 1991 taking care of her because she was sick with the flu. She thought he might have taken her to a clinic on January 4, 1991.

Lankford testified she introduced Ripple to defendant in 1991. She never saw anything suggesting defendant and Ripple were romantically involved, but she reported that by June 1991, Ripple was talking about defendant as if he belonged to her. Ripple also seemed to believe Lankford was in a sexual relationship with defendant and was telling other people bizarre stories about Lankford. In February 1996, Lankford wrote to Ripple, complaining Ripple was spreading vicious lies about defendant and Lankford. Ripple wrote back that defendant had used her and she was getting even with him. But Lankford could not produce Ripple's letter, explaining she had sent it to her parents from prison but they had never received it.

On cross-examination, Lankford admitted she had not told anyone defendant might have been with her when Miller was shot, even though she had been in regular contact with defendant and knew he had been accused of murdering Miller. The prosecutor showed her a letter defendant had written to her in which he made a number of sexual comments and described "doing it" to her in the dining room and up the stairs into the bathroom. Lankford claimed she had not received the letter. She admitted defendant sometimes made sexual remarks to her, but said again that she had never been intimate with him, theorizing that by "doing it," defendant might have been referring to taking drugs. The prosecutor

9

also asked Lankford about Federal Bureau of Investigation (FBI) records detailing a statement she had made. She denied making the statement, denied involvement in the crimes described in the records, and denied she told agents defendant had a gambling habit. She also said she did not recall defendant wearing a dark-colored windbreaker jacket or a navy blue watchman cap. When she was shown the June 1991 photograph of defendant wearing the jacket and cap, she responded she could not say the photograph was of defendant and did not recognize the clothing.

Elaine Tribble confirmed that in late 1990 and early 1991 she was talking to defendant about obtaining a loan from James Gano's mortgage company. She recalled defendant had come to her home in Long Beach on several occasions, but she could not remember which days he visited or exactly when she filled out the mortgage application. She had been unable to locate any of the loan documents and could not remember if they had been returned to her.

Miller's fiancée, Holly Daniels, testified she had worked at or visited the Alameda Market in late 1990 and early 1991. She was very familiar with James Gano and had seen him at the market, but she did not recall that he had ever brought any friends with him and did not remember seeing defendant. She thought that Larry Jones, the man originally picked out of a photographic lineup by Bettina Redondo, might have been ejected from the market for drunkenness.

Sergeant Mark Bergquist, who had been involved in the first phase of the investigation, confirmed that Redondo had picked Larry Jones out of a photographic lineup. He recalled both America Miller and Holly Daniels saying Armando Miller had forcibly ejected Jones from the market. Bergquist took Redondo to a live lineup in March 1991. He remembered seeing Redondo become agitated when faced with Jones, but he said she picked another man out of the lineup and, as they were leaving, said that man also was not the person she had seen. Bergquist said the police had investigated whether Jones or another man

10

might have been involved in Miller's death, but the investigations did not lead to any arrests.

No one who had seen the man in the bank's parking lot said he wore glasses. Heuvelman was particularly struck with the man's deep-set eyes and specifically stated he had *not* worn glasses. John Sano, defendant's parole officer in 1990 and 1991, testified he thought defendant might have worn glasses in 1990. Sano remembered defendant having a mustache but did not think it was the style of mustache described by the prosecution's witnesses. But on cross-examination, Sano agreed he was unlikely to remember if a client had worn glasses on a particular day or to perfectly recall the appearance of a client's mustache. He also agreed defendant was not wearing glasses in a photograph taken of him on the day of his release and had not worn glasses on that day.

Optometrist Dr. Eric Bass testified he had provided glasses to defendant in 1990. He stated his records indicated that, although defendant needed some correction to see distance in his right eye, he required only a very slight correction to his left eye for distance. In his opinion, a person with defendant's prescription would have difficulty reading, but would be able to see and probably would be permitted to drive without correction.

Susan Maitland, the sister of defendant's former wife, Vicki, testified she had been acquainted with defendant since the late 1980's and had socialized with defendant and Vicki in late 1990 and early 1991. She said defendant always wore glasses, was clean and neat in appearance, and his mustache did not match the mustache described by prosecution witnesses. On cross-examination, she admitted she could not recall if defendant always had the same style of mustache.

### D. Prosecution's Penalty Phase Case

#### 1. *Other criminal activity (Pen. Code, § 190.3, factors (b) and (c))*

The prosecution introduced evidence of 15 separate robberies committed by defendant, showing further that defendant had been armed during at least 14 of them.

On September 8, 1981, defendant and three other men, all armed, robbed a Los Angeles savings and loan. During the robbery, one of the men pointed a gun at the teller's face. On June 14, 1991, defendant and another man, both armed, entered a bank in Hacienda Heights, yelling and screaming. They threatened to blow the branch manager's head off; made all the employees and customers lie on the floor; pointed guns between the legs of two male tellers, threatening to blow their "f—ing balls off" if they did not give them hundreds fast enough; and threatened to hurt a baby if the baby did not stop crying. On June 25, 1991, defendant and another man, shouting and brandishing guns, held up a bank in Rowland Heights. One of the men, using a large automatic gun, shot through the glass on the "bandit barrier window" covering the teller service area. The other man had a handgun, which he pointed in turn at each teller, forcing the tellers to give him the cash out of their drawers.

On August 29, 1991, defendant and Ripple committed an armed robbery of a pharmacy and its owner. Defendant was armed with an Uzi submachine gun. On September 4, 1991, defendant and Ripple robbed a pizza restaurant. During the course of the robbery, defendant brandished a weapon that looked like an Uzi. On September 6, 1991, defendant and Ripple robbed a pharmacy in San Pedro and defendant threatened to shoot anyone who followed him. On September 8, 1991, defendant and a woman robbed a florist's shop in Harbor City. Defendant was armed with an Uzi. On September 12, 1991, defendant and a woman robbed a Hallmark store in Seal Beach, during which they herded everyone to the back of

12

the store and forced an employee to open the cash register. On September 18, 1991, defendant and Ripple robbed a pizza restaurant in Lakewood. Defendant put a gun to the owner's head. He became upset as the owner fumbled trying to open the cash register, and Ripple admonished him not to hurt the owner. As they left with the money, defendant told the owner: "Don't come out or I'll shoot you." On September 19, 1991, a woman committed an armed robbery of a florist's shop in Wilmington. After leaving the shop, the woman got into a car driven by defendant.

On September 24, 1991, there was a disturbance at an Alpha Beta supermarket in Hacienda Heights. At the direction of the store's manager, checker David Clure grabbed a woman who was attempting to run out of the store. As Clure wrestled with the woman near the store's entrance, defendant drove up in a car that did not have any license plates. Defendant got out, holding a gun in his hand. He said, "Let her go," and fired the gun into the air. When Clure continued to hold onto the woman, defendant fired another shot into the asphalt near Clure's foot. He fired a third shot, hitting the building over the entrance to the store, and then fired into the door frame. Clure released the woman, who got into the car. Another woman was in the backseat of the car, holding a pistol.

On September 25, 1991, defendant and a woman robbed a San Pedro nail salon and its customers. Defendant, armed with what looked like a large rifle or shotgun, yelled at the customers to throw their purses into the center of the room where they were collected by the woman. On September 28, 1991, defendant entered a shoe store, pulled out a gun, and told an employee, Jerry Song, "Open the register. If you move, I'll kill you." The store's manager, Mark Inki Kim, tried to close the cash drawer and grabbed at defendant's hands. Defendant attempted to shoot Kim several times, but his gun failed to fire. He ran out of the store, chased by Song and Kim, and escaped by diving into a car being driven by a

13

woman. On October 1, 1991, Ripple, armed with a gun, robbed the owner of a San Pedro pet grooming business. Ripple left in a car driven by defendant, who was holding a gun that looked like a machine gun.

On October, 3, 1991, Dolores and Fred Clay, after withdrawing approximately $400 from their bank, were having lunch in a Long Beach restaurant. They noticed defendant and Deborah Lankford at the bar. Defendant and Lankford broke into the Clays' residence later that day. Defendant pointed a gun at them and pushed Fred Clay back into a chair. Defendant took the Clays' money, jewelry, and a savings account passbook. The passbook was recovered from the trunk of defendant's car when he was arrested later in October 1991.

The jury was also provided with certified documents disclosing that defendant had suffered a 1963 conviction for armed robbery, a 1996 conviction for armed robbery, a 1976 conviction for possession of marijuana, a 1967 conviction for felony escape, a 1973 conviction for bank robbery, 1977 convictions for escape from federal custody and bank robbery, a 1981 conviction for bank robbery, and a 1986 conviction for racketeering and extortion.

### 2. *Victim impact evidence (Pen. Code, § 190.3, factor (a))*

Armando Miller's father, Robert Miller, testified that Armando was his oldest son. Robert was working at the family's market when someone from the bank called, telling him there had been a robbery and Armando had been shot and was being taken to the hospital. At the hospital, a doctor told him Armando had been shot in the head and was brain dead. Robert said it felt like "falling in a hole . . . something you're not expecting and it's hard to believe." He said the hurt and the sadness never go away; "[t]he only thing you can do, I guess, is just keep on going and think of other things in your life . . . ."

14

Armando's mother, America Miller, testified that Armando had been a very happy man. At the time of his death, he had a two-month-old daughter who had been very precious to him. America spoke about how difficult it was to lose her son, adding that they had not only lost Armando, "we lost another one, Bobby. He got real hurt because he love Armando . . . . [¶] So Bobby got hurt in his heart. He got so much hate, you know, that he can't trust, who could do this to his brother, so this make him sick for his heart. . . . [¶] So, you know, he don't just kill me one son he kill me two sons." She testified that her other children also missed Armando very much.

### E. Defendant's Penalty Phase Case

The defense presented no evidence at the penalty phase.

## II. PRETRIAL AND GUILT PHASE ISSUES

### A. Delay in Bringing Charges

Defendant, noting that the police had learned his name from the anonymous caller on August 3, 1993, but charges were not filed against him until June 23, 1995, contends the case should have been dismissed for investigative delay. We disagree.

A defendant's state and federal constitutional speedy trial rights (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 1) do not attach before the defendant is arrested or a charging document has been filed. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250.) Nonetheless, a defendant is not without recourse if a delay in filing charges is prejudicial and unjustified. The statute of limitations is usually considered the primary guarantee against overly stale criminal charges (*People v. Archerd* (1970) 3 Cal.3d 615, 639), but the right of due process provides additional protection, safeguarding a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the

15

dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence (*Nelson*, at p. 1250).

A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time. (*People v. Archerd*, *supra*, 3 Cal.3d at pp. 639-640.) Prejudice to a defendant from precharging delay is not presumed. (*People v. Nelson*, *supra*, 43 Cal.4th at p. 1250; *People v. Catlin* (2001) 26 Cal.4th 81, 107.) In addition, although "under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process . . . . If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson*, at pp. 1255-1256.)[1] If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. (*Id.* at p. 1250.) But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified. (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 249; *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 506.)

Defendant claims he met his burden of showing prejudice from the precharging delay through evidence that Elaine Tribble could not remember the specific date defendant had delivered mortgage documents to her in Long Beach and was unable to produce any documents that might have supported his claim of visiting her on January 4, 1991. But defendant made no showing that Tribble's

---

[1]     Because the law under the California Constitution is at least as favorable to defendant as federal law, we apply California law to defendant's claim. (See *People v. Nelson*, *supra*, 43 Cal.4th at p. 1251.)

16

recall would have been more specific had she been contacted earlier, or that she could or would have provided documentary evidence to support his claim. To the contrary, Tribble said she could not remember if any mortgage documents had been returned to her, but if they had been, she had probably destroyed them. Defendant's claim that Tribble would have provided further support for the defense had police arrested defendant earlier is thus mere speculation.

Defendant also complains the delay caused his memory and the memory of James Gano to fade, but again he made no showing of actual prejudice. The record reflects that both defendant and Gano had detailed recall of events occurring on or near January 4, 1991. For example, defendant could describe Tribble's house and its location. He recalled Tribble had told him she had changed her mind about the loan because she would be getting a loan from a family member. He stated that after returning the loan documents to Tribble, he went to Wilmington and then to San Pedro to talk to a prospective client but was unable to find the prospective client. He then called the mortgage company from a pay phone in San Pedro located on Gaffney Street between Second and Fourth Streets, speaking with Gano's partner. Gano did not testify at trial, but at the preliminary hearing he specifically recalled defendant had come to his house on the evening of January 4, 1991. Gano provided a detailed report of the matters they discussed and the actions they had taken as a result of their discussion. Moreover, far from aiding defendant, Gano's testimony at the preliminary hearing directly and explicitly incriminated him.[2]

---

[2]     Gano testified at the preliminary hearing that he and defendant had been friends since they met in Lompoc in 1978. Gano knew the victim and his family, and had introduced them to defendant. He testified he could not recall if he told defendant about the Millers' check-cashing operations, but thought it was possible. He recalled defendant asking how the Millers did their banking, feeling concern

*(footnote continued on next page)*

Defendant also complains the delay rendered him unable to obtain telephone records from the mortgage company that would have shown he called the company from San Pedro on January 4, 1991. When defendant first raised the issue of precharging delay, the mortgage company records appeared to have been lost or destroyed, but by the time defendant testified at trial, the records, comprised of eight boxes found in a storage locker, had been located and examined. Defendant submitted the declaration of his investigator, Kristin Smith, that she had searched through all eight boxes of records for any loan documents that might have related to Elaine Tribble and for any telephone bills for calls received on January 4, 1991. She found telephone billing statements for August 1991 and January and February 1992, but no records for January 1991. Defendant has not shown Smith would have found additional records had the investigation proceeded more quickly.

Defendant also failed to show the delay prevented him from obtaining records from the telephone company. His investigator, Smith, asserted that on August 22, 1997, she requested copies of billing statements for Money Funders Mortgage that included January 1991, but was told the telephone company's records extended back only to August 1991. Assuming, as Smith's declaration suggests, the telephone company kept records for a six-year period, defendant had nearly one and a half years after the date of his arrest in which to obtain the

_(footnote continued from previous page)_

defendant might harm his friends and warning defendant to leave them alone. On the evening Miller was murdered, defendant came to Gano's house. He told Gano "he had to pop the kid," and asked Gano to hide a black steel .22-caliber handgun defendant said he had used to shoot Miller. Gano hid the gun first in his garage and then in the brush near a creek or lake. On the following day, defendant returned, asking Gano for the gun. Gano and defendant retrieved the gun, and defendant left with it.

records he claims would have exonerated him. Further, evidence of a call made on January 4, 1991, would not have provided him with an alibi. According to defendant's testimony, the call was made after he visited Tribble and conducted other business, suggesting that if it was made at all, it was made long after the murder.

Defendant, accordingly, did not meet his initial burden of showing prejudice resulting from the precharging delay. The prosecution therefore was not required to show justification for the delay, and the court had no obligation to balance the harm from the delay against the justification. (*Serna v. Superior Court*, *supra*, 40 Cal.3d at p. 249.) But the record also reflects that the police actively investigated the case after receiving the anonymous call, obtaining defendant's photograph and attempting to corroborate the information provided by the caller.[3] Defendant complains that police investigators could have pursued the case more aggressively, matters might have moved more quickly had investigators immediately shown defendant's picture to witnesses, and investigators chose to give priority to more recent cases or might have factored into their decisions that defendant would be incarcerated for a long time.

---

[3] Detective Solis was told by the caller that a man who owned or worked at an Italian restaurant on Tustin Avenue had said Miller was killed by John Abel, who was then in prison for a series of bank robberies. The caller could not remember the address of the restaurant and said it had closed. She remembered the owner's first name was John, but she did not know his last name. She also mentioned a man named Bobby might have been involved in the murder. Solis reported that, over the next year or so, he unsuccessfully tried to locate the restaurant, its owner, or someone named "Bobby" who might have been the man mentioned by the caller or who might have known defendant. He also spoke with other investigators who had some knowledge of John Abel, but they were unaware of any connection between Abel and another man named "John" or a man named "Bobby."

19

But "[a] court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. ' . . . Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay . . . .' " (*People v. Nelson*, *supra*, 43 Cal.4th at pp. 1256-1257.)  For the same reason, the difficulty in allocating scarce investigative resources provides a valid justification for delay.

We conclude defendant is not entitled to relief on his claim of precharging delay.

### B.  Denial of Motion for Pretrial Lineup

Defendant, before trial, filed a motion for a physical lineup for the purpose of exploring whether he could be identified by Bettina Redondo, Colleen Heuvelman, or any other witness.  He contends the trial court abused its discretion by denying the motion.  We disagree.

In *Evans v. Superior Court* (1974) 11 Cal.3d 617, we held that when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of mistaken identification, due process may require "that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate." (*Id.* at p. 625.)  We reasoned that because the People are able to compel a lineup, fairness requires the defendant be given a reciprocal right to discover and use lineup evidence. (*Ibid.*; see also *People v. Hansel* (1992) 1 Cal.4th 1211, 1221.)  We explained:  "A properly conducted lineup is, among other things, a device by which the People can discover which witnesses are able to identify an accused and thus provide material evidence of guilt.  At the same time the lineup may reveal that other witnesses, perhaps some who should be able to identify the real perpetrator of a

crime, are unable to identify the particular accused as such criminal. If so, that evidence is equally material and access thereto should not be denied an accused." (*Evans*, at p. 623.) A trial court ruling on a request for a pretrial lineup considers the benefits to be derived from it, the reasonableness of the request, and the resulting burden on the prosecution, the police, the court, and the witnesses. (*Id.* at p. 625.) Further, "[t]he broad discretion vested in a trial judge or magistrate includes the right and responsibility on fairness considerations to deny a motion for a lineup when that motion is not made timely. Such motion should normally be made as soon after arrest or arraignment as practicable. We note that motions which are not made until shortly before trial should, unless good cause is clearly demonstrated, be denied in most instances by reason of such delay." (*Id.* at p. 626; accord, *People v. Redd* (2010) 48 Cal.4th 691, 725.)

Defendant's motion, filed on December 30, 1996, was untimely. The complaint charging defendant with the murder of Armando Miller had been filed on June 23, 1995, defendant made his first court appearance in the matter on July 28, 1995, and the preliminary hearing was held on December 14, 1995. Detective Tarpley testified at the hearing that Bettina Redondo and Colleen Heuvelman had picked defendant out of photographic lineups. Defense counsel also observed that identification was a material issue, noting Redondo at one time had identified another man as the gunman, although she later recanted that identification. Defendant, therefore, was well aware that the ability of the witnesses to identify him would be an issue at trial. In *People v. Baines* (1981) 30 Cal.3d 143, we held that, in the absence of good cause for the defendant's delay, the trial court did not abuse its discretion by denying a motion for a pretrial lineup made two and a half months after the date of the defendant's arrest, and one and a half months after the preliminary hearing. The motion in the present case was made a *year and a half* after defendant was arrested on the charges and *a year*

21

after the preliminary hearing. Defendant asserts that the burden of conducting the lineup was lessened because the trial was continued after he filed the motion. But a lineup is always burdensome, and that the trial was continued does not justify defendant's delay in making the motion. Defendant's explanation for the delay was that he had been sent back to prison after the preliminary hearing, counsel had not conferred with him about the matter for another six months, and after discussing the matter they were uncertain whether a pretrial lineup would be of any aid to defendant's case. But neither defendant's failure to act nor the defense team's indecision about trial strategy establishes good cause for delay.

In addition, unlike the situation in *Evans v. Superior Court*, *supra*, 11 Cal.3d 617, where the witnesses' ability to link the defendant to the crime was explored for the first time at trial, the substance and quality of the eyewitnesses' observations in this case and their ability to identify defendant were known long before defendant filed his motion. That the witnesses had picked defendant out of pretrial photographic lineups also meant they could not have been influenced by the inherent suggestiveness of his presence at the defense table. That the witnesses had identified defendant from a photograph taken shortly after the murder was more significant than their ability or inability to pick him out of a live lineup conducted long after the murder. Indeed, the record suggests defendant's appearance had changed somewhat since the time of the crimes.[4]

---

[4] At the hearing on defendant's motion, the prosecutor asserted: "[D]efendant, at least from a facial hair standpoint, looks quite a bit different than the descriptions back at the time of the crime— [¶] . . . [¶] . . . I don't think a lineup would tend to resolve the issue here, because he looks a lot different than he did then." And Bettina Redondo, while confirming defendant's photograph in the photographic lineup was a picture of the man she had seen in January 1991, declined to state whether defendant, sitting at the defense table, was or was not that man, stating that too much time had gone by.

Under the circumstances presented here, due process did not require affording defendant a pretrial lineup.

## C. Judicial Misconduct

Defendant contends the trial court denied him a fair trial and an impartial jury by making quips and sarcastic comments throughout the proceedings. He complains, further, that the court improperly allied itself with the prosecution and created a hostile atmosphere for the defense.

" 'Although a jury trial, especially for a capital offense, is obviously a serious matter, "Well-conceived judicial humor can be a welcome relief during a long, tense trial." ' " (*People v. Monterroso* (2004) 34 Cal.4th 743, 761.) Still, " 'the court should refrain from joking remarks which the jury might interpret as denigrating a particular party or his attorney.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1175.) "When 'the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233.) But a defendant seeking relief on such a theory must establish prejudice. " '[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' " (*People v. Snow* (2003) 30 Cal.4th 43, 78.) We make that determination on a case-by-case basis, examining the context of the court's comments and the circumstances under which they occurred. (*People v. Cash* (2002) 28 Cal.4th 703, 730.) Thus, the propriety and prejudicial effect of a particular comment are

23

judged by both its content and the circumstances surrounding it. (*People v. Melton* (1988) 44 Cal.3d 713, 735.)

In addition, a defendant who fails to make a timely objection to the claimed misconduct forfeits the claim unless it appears an objection or admonition could not have cured any resulting prejudice or that objecting would have been futile. (*People v. Sturm*, *supra*, 37 Cal.4th at p. 1237; *People v. Monterroso*, *supra*, 34 Cal.4th at p. 761.)

### 1. *Disparaging counsel and exhibiting hostility toward the defense*

The court directed a number of sarcastic remarks toward defense counsel, but it by no means spared the prosecutor,[5] indicating its comments were a matter of personal style, not the result of a belief that any of the attorneys was incompetent or that the defense case lacked merit.

Defendant complains generally about the court's comments throughout the proceedings, but specifically cites two remarks. The first was made during a

---

[5]     For example, while questioning Lorraine Ripple about defendant's facial hair, the prosecutor asked: "[Y]ou are talking about between his lips and then you said sometimes he let it grow beyond his lips?" The court interjected, "Between his lips is in his mouth— [¶] . . . [¶] —where you put your foot." On another occasion, after the prosecutor complained defense counsel's line of questioning was improper and would be unduly time consuming, the court stated: "I have found that you know how to make objections and are reasonably familiar with the rules of evidence, occasionally." When the prosecutor objected that defense counsel had mischaracterized the evidence by asking Detective Tarpley if Ripple had told him she had robbed one of the individuals who supplied her with drugs, the court responded: "Sure. Rip off the connection, you like that better." When the prosecutor objected to a defense question, and then attempted to withdraw the objection because he realized the question was likely to lead to evidence favoring the prosecution, the court responded: "Too late. Sustained. Sustained is sustained. [¶] . . . [¶] You got to think before you object. [¶] . . . [¶] But nice try."

24

pretrial conference in connection with a discussion of the extent to which defendant would be restrained during trial. There had been some indication defendant had escaped custody on a past occasion. Defense counsel said the escape was nothing more than a "walkaway" occurring in 1967, asserting: "But Mr. Abel's 53 years old. I think he's been around the block, he has no intention . . . ." The court interrupted, stating: "You know, I'm 61 and I'm going to outlive both of my bailiffs, so 53 doesn't impress me at all. Poor old gentleman. Am I supposed to feel sorry for him?" When counsel sought to explain further, the court stated: "All of that was just silliness, for the record. Ultimately he's going to be handcuffed before the jury." The court's comment could not have influenced the jury, as the jury did not hear it. Nor do we view it as an expression of hostility against defendant or his attorneys. Rather, as with the other remarks made by the court throughout the trial, the comment reflects the court's propensity for quipping whenever the opportunity arose.

Defendant also specifically cites an admonition made by the court during defense counsel's closing argument after the prosecutor had objected that counsel had no evidentiary support for an asserted fact. The court stated it did not know if there was any evidence on the point. It then said: "Ladies and Gentlemen, if either side's attorney intentionally misrepresents any fact during the course of the trial, including their argument, of course, and you think they're lying to you, you can disregard their whole argument if you want to. [¶] Go ahead." Defense counsel, without objecting, responded, "Thank you," and returned to his argument. Later, outside the presence of the jury, the *prosecutor* asked for an admonition. Defense counsel stated he, too, was not "thrilled" with the court's statement. The court denied the prosecutor's request, stating it had only told the jury "what is common sense."

25

The prosecutor, clearly concerned about the court's remark, later told the jury he did not believe defense counsel had been lying and did not think the court meant to suggest counsel was lying, explaining the court was simply telling the jury what the attorneys say is not evidence. The prosecutor continued: "So, I would implore you, please, do not disregard everything [defense counsel] said. He made some points. [¶] It's valid for you to listen to his points, to consider his points. And I would admit to you, and I would tell you right now, he did not intentionally misstate anything." At the conclusion of the prosecutor's closing argument, the court told the jury: "Sometimes the attorneys get overly sensitive about things that the court says. I just want you folks to know that I think that the three lawyers that have worked in this case are the finest lawyers around. I have worked with them for years. They're honorable people. [¶] The court doesn't have any belief that anybody lied to you about anything. I made reference to that at the request of the prosecution."

The trial court's remark was inappropriate and potentially prejudicial, suggesting attorneys might lie to the jury and instructing jurors they could ignore an attorney's entire argument if they believed the attorney intentionally misrepresented anything. That the comment was made during defense counsel's closing argument increased the potential for prejudice to defendant, particularly because it followed the prosecutor's complaint that defense counsel's assertions were not supported by the record. Although defendant did not fully object to the comment, the court by reason of the prosecutor's request for an admonition was aware its comments were objectionable and by its response demonstrated any further objection from defendant would have been futile. Under these circumstances, defense counsel's failure to make a formal objection did not waive the issue. (See *People v. Melton*, *supra*, 44 Cal.3d at p. 735.)

26

But although we find the court should not have made the comment, we also find it did not deprive defendant of a fair trial. By the time the comment was made, the jury was fully familiar with the court's judicial style, and the court's later assurance that all of the lawyers were honorable people limited or eliminated any prejudice from its earlier remarks. Any possible prejudice was further reduced by the court's subsequent instruction that jurors should disregard anything suggesting the court's own assessment of the facts or the credibility of any witness and should form their own conclusions. When considered in the context of the trial as a whole, the court's comment, although improper, could not have had any effect on the jury's verdict.

### 2. *Joking that prospective jurors would be punished if they spoke about the case*

Defendant complains that during voir dire, after admonishing prospective jurors not to talk about the case, the court added: "Because if we catch you talking about the case, we have to have you shot, or some other reasonable form of punishment." In *People v. Monterroso*, *supra*, 34 Cal.4th 743, we rejected a claim that a similar comment, made by the same judge, constituted misconduct. In that case, the court told prospective jurors that any juror who disregarded his instructions should or would be shot. We found the "comments, even when considered in conjunction with the trial judge's numerous other efforts at humor throughout the trial, did not so trivialize the proceedings as to raise a question whether the jurors were fully conscious of the gravity of their decision." (*Id.* at p. 762.) We reach the same conclusion here.

### 3. *Allying itself with the prosecutor and preventing the defense from presenting its case*

Defendant asserts the court improperly and prejudicially allied itself with the prosecutor by commiserating openly about defense counsel, taking an active

27

role in the examination of witnesses to bring out evidence favorable to the prosecution, and interfering with the defense.

Defendant's claim that the court commiserated with the prosecutor is based on the court's comments after the prosecutor complained that defense counsel was testifying rather than soliciting evidence from a witness. The court responded, "I don't know how to stop him; do you have a hint for me . . . ?" The prosecutor replied, "All I can do is object." The court then sustained the objection. The court's response did not suggest an alliance with the prosecutor. To the contrary, the court implicitly chided the prosecutor while making the point it would not rule in the absence of an objection.

As to the claim the court improperly interjected itself into the proceedings to bring out or clarify the evidence, " 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' " (*People v. Sturm*, *supra*, 37 Cal.4th at p. 1237.) But "[t]he object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered." (*People v. Mendez* (1924) 193 Cal. 39, 46.) To this end, "the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination." (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1206.) "[I]t is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact." (*People v. Carlucci* (1979) 23 Cal.3d 249, 255; see Pen. Code, § 1044 ["It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."].)

Defendant complains that the court directed defendant to take off his glasses so Bettina Redondo could see his face. The direction was consistent with

28

the court's duty to see that justice is done and to bring out facts relevant to the jury's determination. (See *People v. Santana*, *supra*, 80 Cal.App.4th at p. 1197.) That the court later denied the prosecutor's request that defendant be directed to put on a hat to allow Redondo to see defendant's facial features in the same manner as she had observed the features of the gunman demonstrates the court was not favoring the prosecution. Defendant also complains that after Colleen Heuvelman testified she told the police the man she had seen had been wearing a long military-style trench coat, the court remarked that a coat or jacket then shown to the witness, apparently a trench coat, was not a military-style coat. The court should not have interjected its own knowledge of military-style coats into the proceedings, but its comment, if anything, undermined the prosecution's attempt to show defendant was the man Heuvelman had seen.

Defendant next complains that the court improperly interfered with defense counsel's cross-examination of Heuvelman. Counsel, armed with a transcript of Detective Tarpley's interview of Heuvelman, observed that Heuvelman had told Tarpley that, as she was chatting with Miller just before leaving the bank to take care of her son, her son was behaving "like a wild man." Counsel asked Heuvelman if her son had been with her. After she said yes, he asked if the son had been acting like a wild man. Heuvelman said yes. Counsel asked if the son had been running around. Heuvelman said she had needed to restrain her son earlier, but her son was standing next to her, holding her hand, when she was speaking with Miller. The court then called the attorneys to the bench and said to defense counsel: "Mr. Freeman, if you've got some prior inconsistent statements or something that you want to impeach her with, get to it, don't be reading the entire transcript into the record. I don't care about the kid and how he was running around the place or any of that kind of silliness." Counsel explained he was trying to impeach the witness's earlier statement that she could not recollect if

29

her son had been with her at the bank. The court replied: "I don't care about the kid, it's superfluous and it's not improper [*sic*] impeaching. [¶] The court's objection is sustained." The court then allowed counsel to examine the witness about matters, including her son's conduct, that might have distracted her when she was watching the man in the bank's parking lot.

Contrary to defendant's argument, the court did not prevent defense counsel from testing the witness's powers of observation or her memory of events. It forestalled an irrelevant discussion of the son's presence and conduct in the bank. That the son was with Heuvelman and was presenting distractions had never been in dispute. The court's "silliness" remark, made at the bench, could not have influenced the jury.

Defendant complains the court improperly curtailed his cross-examination of Detective Solis. Solis testified about a field showup during which witnesses were asked if a man found in the area shortly after Miller was shot was the man they had seen in the bank's parking lot. None of the witnesses identified the man, who was then released. Defense counsel later asked if Solis recalled a witness had said the man fit the gunman's profile. The court summoned the attorneys to the bench and remarked that Solis's report of a witness's statement would be hearsay. Defense counsel asserted the evidence was being offered to test the detective's credibility or recollection, not for the truth of the matter stated. But because Solis's ability or inability to recall the details of the field showup could not have aided the defense, it is likely the defense was soliciting hearsay evidence. In any event, the field showup took place *because* the man resembled the descriptions of the gunman; that a witness agreed he resembled the gunman added nothing to the defense case. Finally, Solis had little reason to recall if a witness confirmed the resemblance; the important point to him would have been that the witnesses said the man was not the man they had seen. Counsel's line of questioning thus was

30

not directed at any admissible evidence that could have aided defendant. The court's refusal to allow further questioning on the matter therefore was well within its discretion to manage the trial. Moreover, defendant could not have been prejudiced by the court's ruling.

The proceedings relating to defense investigator Douglas Portratz are somewhat more disturbing, although for reasons having nothing to do with judicial misconduct. Portratz spoke with witness Bettina Redondo in January 1997, a few months before trial commenced. Redondo testified Portratz showed her photographs of defendant and of James Gano's brother-in-law, Craig Elz, compared them to the composite drawing Redondo had helped prepare, told her Elz's photograph more closely resembled the drawing than defendant's photograph, and told her Elz had been involved in another robbery. Redondo felt Portratz was trying to convince her Elz had murdered Miller. The court called the attorneys to the bench and asked the prosecutor if he had caused Portratz to be arrested for attempting to dissuade a witness. When the prosecutor said no, the court said: "Why not? I mean, I haven't seen a better case for it than this. [¶] . . . [¶] Is it in the scheme of things, I hope?" The court's remarks, made out of the jury's hearing, could not have caused the jury to think the court believed the defense team had acted dishonestly. Defendant, however, asserts the comments must have had a chilling effect on the defense. But that the court was legitimately concerned a defense investigator may have attempted to influence a witness should not have caused the defense to shy away from presenting legitimate evidence to support its case. Further, nothing in the record hints that the court's words chilled defense efforts. To the contrary, after the bench conference defense counsel cross-examined Redondo at length, exploring Redondo's reasons for believing Portratz was trying to convince her Elz was the murderer; making the point that other persons, including Elz, generally met the description of the man

31

Redondo had seen; and eliciting Redondo's statement she could not be certain defendant, as he appeared at trial, was that man. The jury also heard a tape of Portratz's interview with Redondo and was provided with a transcript of the interview. The defense therefore was able to, and did, use material from the interview to suggest Redondo may have been mistaken, and the jury was fully informed about the statements both Redondo and Portratz made during the interview.

Defendant next complains the court repeatedly denied defense requests for a sidebar conference, while granting the prosecution's requests. He provides two examples. In the first, defense counsel, after objecting to the form of the prosecutor's question, asked if the court wished the attorneys to approach the bench. The court overruled the objection and denied the request to approach. In the second, defense counsel, during the prosecution's redirect examination of a witness, objected that the prosecutor seemed to be misrepresenting that the defense had pursued a particular line of questioning. The court agreed it could not recall if defense counsel had asked the disputed questions. Defense counsel then asked to approach the bench. The court denied the request. After asking a question on another subject, the prosecutor asked to approach the bench, explaining he wished to cover two additional areas but thought he had better approach before going forward. The court granted the request. Nothing in either exchange suggests the court favored the prosecution. Having heard the defense objections, the court could assess whether a sidebar conference was necessary. But it did not know what areas the prosecutor intended to pursue. By granting the prosecutor's request, the court thus protected defendant from the possibility the prosecutor would elicit testimony that might unfairly damage defendant's case. Defendant has no cause to complain.

32

Defendant asserts the court unfairly and improperly suggested defendant's wife had been in jail. He mischaracterizes the court's words. Defense counsel had asked Lorraine Ripple if she recalled when defendant got married. The court stated: "That's hearsay, counsel. Sustained. She's probably in custody now." In context, it appears the court was referring to *Ripple's* time in custody, observing that because Ripple was in custody at the time of the wedding, anything she said about it would be based on hearsay. Further, defendant did not object or seek an admonition, forfeiting his claim of error.

The court also on many occasions sustained defense objections and sometimes made its own objections to the prosecutor's questions. It also on its own initiative acted to protect defendant. For example, after defense counsel asked Lorraine Ripple if Detective Tarpley had said why he had contacted her, the court called counsel to the bench and warned that the question might open the door to evidence that would cause the jury to learn about all of defendant's criminal activity.

In sum, the record does not support defendant's claim that the court allied itself with the prosecutor against him, prevented him from exploring weaknesses in the prosecution's evidence, or prevented him from presenting a full defense.

### 4. *Biasing the jury toward the death penalty*

Defendant complains the court expressed a pro-prosecution bias during voir dire by suggesting it favored the death penalty and believed persons willing to impose the death penalty have more character or inner strength than persons who would choose against death.

"[T]rial courts should be evenhanded in their questions to prospective jurors during the 'death-qualification' portion of the voir dire, and should inquire into the jurors' attitudes both for and against the death penalty to determine

33

whether these views will impair their ability to serve as jurors." (*People v. Champion* (1995) 9 Cal.4th 879, 908-909.) But the portion of the voir dire to which defendant refers here was not a part of the court's attempt to explore prospective jurors' attitudes toward the death penalty. Rather, the court was impressing on the prospective jurors that should they find defendant guilty, they would have no option but to impose a very serious penalty. It explained that if jurors found defendant was guilty of a murder committed during the course of a robbery, they would be required to impose a penalty of either life without the possibility of parole or death. The court then asked if prospective jurors would have difficulty imposing *either* penalty and whether in determining the penalty they would consider and weigh mitigating and aggravating factors. The court's remarks were designed to impress on the prospective jurors the gravity of their task; they entailed no suggestion that the court favored one penalty over the other, or favored the prosecution over the defense.

In a related claim, defendant asserts the court during voir dire twice improperly insinuated a sentence of life without the possibility of parole might not mean defendant would be imprisoned for the rest of his life. Defendant somewhat mischaracterizes the court's comments. The court again was acknowledging that both death and life without the possibility of parole are significant penalties and explaining that if the trial reached the penalty phase, the jury would be required to choose one or the other. It explained that although it was impossible to guarantee the jury's verdict would be enforced, that uncertainty should not distract jurors from the gravity of their decision. The court thus explained that, generally speaking, a sentence of life without the possibility of parole means the defendant will spend his life in prison and will die there. It later stated: "Previously I told you that for purposes of your decision, you have to assume that the government will keep the man locked up for his entire life and he'll die in prison. That's the

assumption you have to make. We're not telling you and guaranteeing to you that that's true. We're simply trying to impose upon you the gravity of your responsibility as jurors. [¶] And with regards to that very strong gravity of your responsibility, you must assume that if you impose life without parole, that means what it says; if you impose the death penalty, that means that ultimately the death penalty will be carried out." The remarks were not made in a context that would convey to the prospective jurors that defendant might be released if the jury did not impose a verdict of death; the court was impressing on them that they would have no option but to impose one of two harsh penalties were they to return a verdict finding defendant guilty of first degree murder.

Defendant complains the court rushed the jury toward a verdict of death by observing at the end of the guilt phase that juries generally have no reason to listen to all the testimony a second time. He cites the court's remark that the process of having the reporter read back testimony is time-consuming and the court's request that the jury determine whether a rereading was necessary before asking for one. The court's words, spoken at the end of the guilt phase, did not suggest the court was biased toward death. Nor do we see anything in them rushing the jury toward a verdict or suggesting the jury could not ask for a rereading of the testimony if it wished. The court was simply explaining there was good reason to refrain from requesting a rereading if it would not be helpful. Any possible misunderstanding would in any event have been cured by the court's further explanation that it was not intending to dissuade the jury from receiving the testimony, and its admonishment that "[y]ou may take as long or as brief a time as you need to reach a verdict. You are under absolutely no time requirements or constraints in reaching such a verdict."

We conclude defendant is not entitled to reversal for judicial misconduct.

**D. Admission of Evidence of Threats to Ripple and Her Family and Evidence of Defendant's Gang Affiliation; Prosecutorial Misconduct**

Defendant contends he suffered irremediable prejudice, requiring reversal of the judgment, because Lorraine Ripple was allowed to testify that he was affiliated with a gang and to suggest he had threatened her and her sons to prevent her from testifying.

The first mention of what defendant now claims was inadmissible evidence occurred in response to questions by defense counsel. The prosecutor had elicited from Ripple testimony that defendant had told her he killed someone in Tustin who had a little ministore that cashed checks for "wetbacks." She also stated defendant had given her the gun he used, which she had later traded for drugs. During cross-examination, defense counsel explored several areas with Ripple and then asked if police investigators had offered her some kind of benefit in exchange for her agreement to testify. She replied that an investigating officer had offered to put in "a good word" to have her transferred to the California Institution for Women (CIW) for the trial and that she had responded, "yeah, that's some deal." Before counsel asked another question, Ripple added: "And it's like right now, I've got my son, all my friends, I have got two letters in the past week, one from Arizona prison, one from Leavenworth that are flat out: don't take the stand, don't say a word. And I'm—you know, I've got a lot of problems even with my sons over this." Defendant did not move to strike the comments or ask the court to admonish the jury.

On redirect, the prosecutor referred to Ripple's outburst, saying: "I think you indicated something about having sons in Arizona, things of that nature, that caused you some concern as you sit here today. Could you please explain what you were talking about to the jury?" Ripple replied, "Okay. My son is also affiliated with a gang that [defendant] was once a member of—" The prosecutor

36

interrupted, "Before we talk about that, I just—" Ripple stated, "Is that what you wanted?" The prosecutor said, "I just want to ask do you have any concerns over your own son's safety?" There was no further mention of gang affiliation. In response to the prosecutor's further questions, Ripple testified she had one son in state prison and another in federal prison. She stated she had received letters directing her not to take the witness stand and she believed her decision to testify placed her and her sons at risk. Ripple also said Deborah Lankford did not want her to testify and had written to other inmates in Ripple's unit. Ripple said she had been attacked by six inmates in the prison yard. Defense counsel interrupted, objecting that the prosecutor was seeking hearsay evidence. The court overruled the objection. The prosecutor then asked why Ripple had agreed to testify against defendant. Ripple's only response was that she had developed "respect" for Mike Proctor, one of the officers who had investigated Ripple in connection with her own crimes, who had asked her to contact him if she ever decided to talk about anything. Ripple reported she had since provided information to Proctor on several occasions. Later, after questioning Ripple on other topics, defense counsel returned to the officer's offer to have Ripple moved to CIW, reading from a letter Ripple had written to the officer, in which she wrote: " 'Let's face another fact. You're offering me one year at C.I.W. and the rest of my life in the hole.' " Ripple, agreeing the officer had made the offer, then said: "And while we're putting all this in the record, let's go one better. [Defendant has] had Debbie [Lankford] sending all this paperwork to every god damn prison in the fuckin' state laying on my sons to keep me off the stand. Now, put that in your record if one of my kids gets hurt."

Defendant did not at that time move to strike or seek an admonition to the jury. But after Ripple's testimony concluded and the jury was excused for the day, defendant moved for a mistrial, arguing that the prosecution had elicited improper

37

character evidence about gang connections and letters threatening the witness. The court denied the motion. On the following day, after further discussion, the court adopted the prosecutor's suggestion to treat defendant's motion for a mistrial as a timely objection to the evidence. It then admonished the jurors: "During redirect examination, the defense objected to a portion of witness Lorraine Ripple's testimony regarding possible retaliation against herself or family members. Upon further reflection, the court believes . . . the objection to be a proper one. You are therefore instructed that the answer of the witness dealing with that limited portion of her testimony is stricken. You are hereby instructed not to consider or discuss that portion of her testimony in any fashion in deciding this case."

A defendant who fails to make a timely objection or motion to strike evidence may not later claim that the admission of the evidence was error (*People v. Burgener* (2003) 29 Cal.4th 833, 869; *People v. Hayes* (1999) 21 Cal.4th 1211, 1261) or that the prosecutor committed misconduct by adducing it (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072). Further, "[w]hen an objection is made to proposed evidence, the specific ground of the objection must be stated. The appellate court's review of the trial court's admission of evidence is then limited to the stated ground for the objection. (Evid. Code, § 353.)" (*People v. Kennedy* (2005) 36 Cal.4th 595, 612.) "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot

38

argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

The present case illustrates the reason for the foregoing rule. During Ripple's testimony on redirect examination by the prosecutor, wherein she referred to threats of retaliation against herself and her sons, defendant's only objection was that the testimony was hearsay, but he now complains that the evidence was irrelevant and inflammatory. A timely objection on those grounds, if sustained, would have prevented any further testimony on the subject of threats and would have allowed the court to make an admonition to reduce any prejudice from the testimony already heard by the jury.

Nonetheless, in light of the trial court's decision to treat the matter as if defendant had made a timely objection, we will review the merits of his argument. As defendant observes, this court has held that evidence of a third party's attempt to intimidate a witness is inadmissible against a defendant unless there is reason to believe the defendant was involved in the intimidation. (E.g., *People v. Williams* (1997) 16 Cal.4th 153, 200-201; *People v. Hannon* (1977) 19 Cal.3d 588, 599.) But we were responding to the use of the evidence to show the defendant's consciousness of guilt; we were not concerned with whether it was relevant to some other issue, such as the witness's credibility. (*Hannon*, at p. 599; *People v. Weiss* (1958) 50 Cal.2d 535, 554.) Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact or consequence, including evidence relevant to the credibility of a witness. (Evid. Code, § 210; *People v. Kennedy*, *supra*, 36 Cal.4th at p. 615.) Thus, " '[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

39

"Moreover, evidence of a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant." (*Ibid.*) Ripple's credibility was a significant issue in this case. The evidence therefore had substantial probative value, justifying its admission. (Evid. Code, § 352.) The court did not err by denying defendant's motion for a mistrial.

Defendant's related argument that the prosecutor committed misconduct by eliciting evidence of defendant's gang affiliation and possible threats to Ripple also fails. A prosecutor commits misconduct by intentionally eliciting inadmissible testimony. (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) That was not the situation here. As we have said, evidence of real or perceived threats to Ripple or her sons was relevant to the issue of Ripple's credibility. Whether evidence of defendant's gang affiliation was relevant to Ripple's credibility is debatable, but even assuming the evidence should not have been admitted, the record fails to support defendant's claim of misconduct. Defendant asserts the prosecutor "cleverly calculated the introduction of inadmissible evidence to prejudice defendant . . . [by specifically] asking Ripple to talk about her concerns for her sons, knowing it would undoubtedly lead to a disclosure about [defendant's] gang affiliations." Ripple, however, first mentioned her sons in response to *defense counsel's* questions. When the prosecutor on redirect asked her to explain, and Ripple for the first time mentioned gang affiliation, the prosecutor interrupted and quickly changed the subject to focus on the sons' imprisonment. Defendant finds support for his argument in Ripple's further statement, after the prosecutor's interruption, "Is that what you wanted?" In context, however, it appears the prosecutor wanted Ripple to talk about the threats she or her sons had received, was surprised by her mention of gangs, and changed the subject to prevent prejudice to defendant. This interpretation is consistent with the prosecutor's later request for a jury admonition and his emphasis during

closing argument that the jury should not consider evidence of defendant's criminal past except for the limited purpose of defendant's credibility.

In any event, the gang reference was brief and indicated only that defendant had once been a member of a gang. It could not have prejudiced defendant in the eyes of the jurors, who were fully aware defendant was a dangerous man who had committed numerous violent crimes and had spent a substantial portion of his life in prison. Finally, any possible prejudice was dispelled by the court's admonition to the jury to disregard that portion of Ripple's testimony. (*People v. Burgener*, *supra*, 29 Cal.4th at p. 870 [any error in admitting evidence is harmless where the court has instructed the jury to disregard the evidence].)

Defendant also complains that even if evidence of threats against Ripple or her family members was admissible, the prosecutor committed prejudicial misconduct by asserting during closing argument that Ripple was testifying "at great risk to herself and great risk to her family," because the court had admonished the jury that it should not consider evidence of retaliation against Ripple or her family. The court's admonition, however, was not a blanket instruction to disregard all evidence of threats against Ripple; it was directed toward Ripple's responses to the prosecutor's questions during redirect examination. Other evidence also tended to show Ripple had reason to fear retaliation, such as her responses to defense counsel's questions, Deborah Lankford's testimony about telling friends in the prison system that Ripple was informing on defendant, and Lankford's concession that a prisoner risked his or her life by informing on someone. The prosecutor was entitled to draw an inference from this evidence that Ripple knew her testimony was putting her and her family at risk. " 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the

41

prosecutor draws are reasonable is for the jury to decide.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 179.)

We conclude, for the reasons we have stated, that defendant has shown neither that the trial court erred nor that the prosecutor committed misconduct.

### E. Admission of Evidence of Defendant's Arrest for an Unrelated Crime and of the Weapons and Pill Bottle Found in His Possession at the Time of His Arrest

Defendant contends reversal is required because Detective Steven Rubino, who arrested defendant in 1991 for an unrelated crime, was permitted to testify about guns and ammunition discovered during a search of defendant's car, and because the guns and ammunition were shown to the jury.

The complained-of testimony followed the examination and cross-examination of Lorraine Ripple. Defense counsel, apparently seeking to discredit Ripple, asked if investigators had ever told her defendant had "given her up?" Ripple responded that Detective Tarpley had told her a pill bottle with her name on it had been found in defendant's car at the time of his 1991 arrest. Counsel then asked if Ripple had told Tarpley she had been involved with defendant in other murders, eliciting her testimony that defendant had given her the .22-caliber murder weapon after Ripple told him she needed a gun to kill someone; he had given her other guns, including a MAC-11 semiautomatic pistol; her acquaintances passed guns around freely; she had traded the murder weapon for drugs; she had robbed her Mexican drug connection or connections several times; and defendant liked to brag about his crimes, including the murders he had committed.[6]

---

[6] As mentioned above, the trial court, clearly concerned with counsel's questions, called the attorneys to the bench and warned the defense that this line of inquiry could cause the jury to learn far more about defendant's criminal history

*(footnote continued on next page)*

On redirect, Ripple testified it was common for anyone in her circle of acquaintances who needed a gun to ask for one and to give it back later. She described a number of weapons that had been "floating around," also testifying she had seen defendant with a MAC-11 semiautomatic pistol and a .22-caliber handgun that was not the gun used to kill Miller. The prosecutor then showed Ripple several firearms contained in evidence envelopes. Ripple stated that a MAC-11 and a .22-caliber handgun looked like those she had seen in defendant's possession. She identified a .38-caliber handgun as her own, saying she had used it in several robberies.

Defendant did not object or seek an admonition. But as discussed previously, he moved for a mistrial after Ripple's testimony was completed. We earlier considered and rejected the argument that a mistrial should have been granted because Ripple had linked defendant to a gang and expressed her belief that her cooperation in defendant's prosecution threatened her own safety and that of her sons. As relevant here, counsel also complained that the jury had seen guns unrelated to Miller's murder, asserting jurors were likely to assume defendant had used the guns during the commission of other crimes. The court denied the motion for a mistrial and adjourned the proceedings for the day.

The following morning, before the jury was called in, defense counsel expressed concern that prosecution witness Detective Steven Rubino would testify that the guns had been recovered during a search of defendant's car in connection

*(footnote continued from previous page)*

than defendant might wish. Counsel responded that the defense team had discussed the matter with defendant and had decided to ask Ripple about her statements to police that defendant had committed other murders. He explained the statements would support the defense claim that Ripple's obsession with defendant caused her to fabricate stories about him and his criminal activities.

with an unrelated crime. Counsel argued that evidence defendant had possessed weapons on another occasion was irrelevant, cumulative, unduly prejudicial, and "pushed up . . . against the edges of" impermissible character evidence.

By this time, the defense had requested a psychiatric examination of Ripple and had expressed its intent to discredit her testimony by establishing she was obsessed with defendant and had been fabricating stories about his criminal activities. The prosecutor asserted Rubino's testimony would corroborate Ripple's statements about defendant's gun possession. After further discussion, it was agreed Rubino's interaction with defendant would be referred to as a "contact" rather than an arrest, and Rubino would explain the guns were not linked to Miller's murder.

Rubino then testified, without defense objection, that in October 1991 he was part of a multijurisdictional criminal apprehension detail that led him and approximately nine other officers to follow defendant to a parking lot where defendant's car was parked. Rubino testified he then contacted defendant. The prosecutor asked, "When you contacted him, was he contacted by several deputies with guns drawn?" Rubino said yes. Defendant did not object. Rubino then testified he searched defendant's car, finding a loaded MAC-11 semiautomatic pistol under the right front passenger seat, a loaded .22-caliber pistol under the driver's seat, some additional fully loaded magazines, a photograph, and a plastic vial with Lorraine Ripple's name on it. He said the .22-caliber pistol was not related to Miller's murder.

After Rubino was excused and the jury was in recess, defense counsel again asked for a mistrial, complaining the detective's testimony was even more prejudicial than anticipated. The court denied the motion.

Evidence a defendant possessed weapons that were not used to commit a crime is inadmissible to show the defendant committed the crime. (*People v.*

44

*Riser* (1956) 47 Cal.2d 566, 577.)  But here, the evidence was introduced for a different reason:  to corroborate Ripple's testimony of having seen similar weapons in defendant's possession during the same general time period.  Similarly, evidence police found a pill bottle with Ripple's name on it in the trunk of defendant's car corroborated Ripple's testimony that Detective Tarpley had told her about the discovery of the pill bottle when he told her defendant had "given her up."  That the evidence was not admissible to show defendant committed a criminal act did not prevent it from being admitted on the issue of Ripple's credibility.

Defendant also contends the evidence was inadmissible under Evidence Code section 1101, subdivision (a):  "[E]vidence of a person's character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."  But subdivision (a)'s restriction on the use of character evidence has no application when the evidence is offered on the issue of a witness's credibility.  (*People v. Stern* (2003) 111 Cal.App.4th 283, 297.)  Indeed, subdivision (c) of Evidence Code section 1101 expressly allows the admission of evidence for that purpose.  In addition, defendant's objection was that the evidence was cumulative and inflammatory.  Although he asserted the evidence "pushed up" against the edges of Evidence Code section 1101, he did not object that it *was* inadmissible character evidence, thus forfeiting the claim.  (*People v. Partida*, *supra*, 37 Cal.4th at p. 435; *People v. Kennedy*, *supra*, 36 Cal.4th at p. 612.)  This rule has particular force here because counsel's assertion suggested a concession that the evidence did not violate Evidence Code section 1101; thus, there was no reason for the court to analyze the point.

Defendant contends he was excused from the necessity of making a timely objection or request for admonition because the trial court's rulings on the objections he made both before and after Detective Rubino's testimony

45

demonstrated that a further objection or request would have been futile. (See *People v. Hill* (1998) 17 Cal.4th 800, 820.) If by this contention defendant means the court had indicated it would reject an argument that the evidence was inadmissible character evidence under Evidence Code section 1101, subdivision (a), we agree. As we have said, subdivision (a)'s restrictions on evidence have no application where, as here, the evidence relates to a witness's credibility. To the extent defendant argues the trial court's rulings excused him from objecting that the witness's statements were inflammatory, or from seeking a jury admonition on similar grounds, we do *not* agree. When defendant expressed concerns about the prejudicial effect of Rubino's testimony, the court responded by admonishing the prosecutor that Rubino should not speak of an arrest, with the result that the prosecutor proposed to have the witness refer to the arrest as a "contact." There is no reason to assume the court would have been unresponsive to other complaints about the prejudicial nature of the evidence had defendant made a meritorious objection.

Finally, evidence defendant possessed weapons at the time of his arrest in October 1991 could not have prejudiced defendant, who admitted to multiple armed robberies, including a series of armed robberies during that year.

For all the above reasons, we conclude the admission of evidence of defendant's 1991 arrest and the weapons and pill bottle found in his car at the time of his arrest provides no basis for reversal.

### F. Lorraine Ripple's Psychiatric Records

During cross-examination, defense counsel asked Ripple if she had any history of mental health treatment. She replied she had recently received treatment for trouble sleeping due to isolation. She also spoke of a long-term personal and professional relationship with a psychologist who was writing a book on prolonged isolation. Defense counsel subsequently filed a motion to appoint a

psychologist to examine Ripple for mental illness and requested access to Ripple's psychiatric, disciplinary, and drug treatment records. In support of the motion and request, defense counsel referred to Ripple's statements about her mental health treatment and her angry response to defense questions. He further asserted, on information and belief, that Ripple had displayed "bizarre behavior" while incarcerated, had at one time slashed her own throat, and had been placed on a suicide watch. He claimed that inmates reported Ripple fantasized about defendant. Defense counsel explained: "All of the above combination of facts and circumstances are such that there is a grave concern by defendant that the mental health of the witness is significantly impaired. Her state of depression may well contribute to her flights of fantasy regarding the defendant. She may no longer have an ability to distinguish fantasy from reality."

The trial court did not order the examination, but it ordered the California Department of Corrections to release Ripple's psychiatric records to the court. After reviewing the records in camera, the court explained it had balanced defendant's need for the records against Ripple's privacy rights and had determined the records contained nothing of particular value to the defense. The court read to the jury the only portion of the records it found relevant to defendant's argument that Ripple's credibility was affected by her mental health problems: " 'Ripple, Lorraine. Since inmate Ripple, W27065, is not suffering from a serious mental disorder, and since more than six months has elapsed since her previous self-destructive behavior, it is recommended that the "Sharps restriction" described in my chrono dated 5/28/96 be lifted. [¶] Although Ripple is perhaps a no greater than average risk of dangerousness to herself at this time, this does not mean that her dangerousness to others has declined.' "

Defendant does not dispute that the trial court properly reviewed the psychiatric records in camera. (See generally *Pennsylvania v. Ritchie* (1987) 480

47

U.S. 39, 58; *Davis v. Alaska* (1974) 415 U.S. 308, 320; *People v. Gurule* (2002) 28 Cal.4th 557, 591-595; *People v. Hammon* (1997) 15 Cal.4th 1117, 1124; *People v. Webb* (1993) 6 Cal.4th 494, 518.)  He claims, however, that the court erred by failing to disclose material he could have used to impeach Ripple, thereby violating his constitutional right to confrontation (U.S. Const., 6th & 14th Amends.).[7]

As an initial matter, whether defendant's arguments are properly directed at the right of confrontation is far from certain.  " 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' " (*Davis v. Alaska*, *supra*, 415 U.S. at pp. 315-316, italics omitted.) The high court has not decided if the right of confrontation embraces a right to discover information necessary to make cross-examination effective.  That question arose in *Pennsylvania v. Ritchie*, *supra*, 480 U.S. 39, but the justices did not reach a consensus.  As we have since explained, "after [*Ritchie*], 'it is not at all clear "whether or to what extent the confrontation or compulsory process clauses of the Sixth Amendment grant pretrial discovery rights to the accused." ' " (*People v. Gurule*, *supra*, 28 Cal.4th at p. 592.)  Although defendant in this case did not seek discovery of the records until after trial had commenced, the uncertainty attending application of the confrontation right to discovery logically extends to his complaint that the trial court's failure to disclose Ripple's psychiatric records at trial deprived him of information he could use to cross-examine her.

---

[7]     After trial in this matter was completed, Ripple executed a release of the records, waiving her privacy rights in them.  Defendant therefore has reviewed the records in their entirety and cites specific portions to support his arguments.

We need not resolve the question here. Claims such as defendant's implicate the fundamental fairness of trials and are therefore subject to analysis under the due process clause of the Fourteenth Amendment to the United States Constitution. (*Pennsylvania v. Ritchie*, *supra*, 480 U.S. at p. 56; *People v. Martinez* (2009) 47 Cal.4th 399, 451-453; *People v. Gurule*, *supra*, 28 Cal.4th at pp. 592-593; *People v. Hammon*, *supra*, 15 Cal.4th at pp. 1126-1128; *People v. Webb*, *supra*, 6 Cal.4th at pp. 517-518.) We have recognized that "[w]hen a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon . . . to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve." (*Hammon*, at p. 1127.) In this context, the records should be disclosed if they are "material." (*Martinez*, at p. 453.) " ' "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." ' " (*Ibid.*) We also consider any adverse effect nondisclosure might have had on counsel's investigations and trial strategy. (*In re Brown* (1998) 17 Cal.4th 873, 887.) Nothing in Ripple's psychiatric records rises to this standard or implicates the preparation or presentation of defendant's case.

Defendant could not have used the records to argue Ripple suffered from a mental health problem affecting her credibility. The records do not suggest Ripple suffered from delusions or hallucinations, nor do they contain any reports of cognitive difficulties or other problems that could have affected Ripple's ability to perceive, recall, or describe events, or her ability or willingness to tell the truth. Defendant cites references in the records to "antisocial personality disorder" and "psychopathy," but the terms are not defined and, even if in some contexts they might be used to describe traits relevant to credibility, the contexts in which they

49

are used here generally refer to the difficulties Ripple was experiencing adjusting to prison life.[8]  That Ripple was unhappy, difficult, and antisocial was clear from her trial testimony; an awareness that a prison psychiatrist had described her as antisocial and psychopathic could not have affected the jury's view of her credibility.  Nor do the records show or suggest Ripple was in any way obsessed with defendant so as to support that defense theory.

Defendant's chief argument has nothing to do with Ripple's mental health. He contends disclosure of the records would have allowed him to impeach Ripple by showing she was promised a significant benefit for testifying against him and was threatened with harsh consequences should she decline to testify.  Defendant claims he could also have shown that both Ripple and Detective Tarpley were untruthful because each testified Ripple had received no benefit for her testimony, with the result the jury would have concluded Tarpley was either untruthful or incompetent, thus fatally undermining the prosecution's case.

In support of this argument, defendant cites a paragraph in a May 1996 psychologist's evaluation.  The evaluation includes the psychologist's report of Ripple's explanation of her reasons for an aggressive outburst at a meeting with the institutional classification committee.  It recites that Ripple told him "they" had told her she could do what they wanted or she could rot in the secured housing unit, and they wanted her to testify against her " 'ex-old man' " " '[b]ecause I ran

---

**8**     For example, defendant cites a September 19, 1996, mental health assessment that recites:  "Ripple slit throat 2/9/96.  Impulsive act after verbal exchange w/ staff.  Not seriously depressed then or now.  Extreme psychopathy in my opinion.  Been 6 months since attempt.  No [significant suicide history] noted described.  Dangerousness to others . . . to self, avg."  The same record reports Ripple's cognition as "[n]ormal, but antisocial," and further recites that no perception disturbances were noted and Ripple did not exhibit any delusions or problems with orientation, memory, attention, or concentration.

a lot with the Aryan Brotherhood gang members over the years and saw and know about a lot of killings. My ex-old man was an enforcer for the Chicago Crime Family, John Able [*sic*]. If they think I'm gonna tell them something that's gonna endanger my sons in prison they're nuts'. . . . 'I got upset, I'll grant you that. They told me if I testified they'd transfer me south. What a deal huh? I can give them information that'll get my sons killed and trade that for being able to go to a prison down south where I can see my grandchildren.' " Defendant also cites the handwritten notes of a psychologist on a master mental health treatment plan dated February 13, 1996: "testify pressing to go to CIW," and "under pressure from Orange County to testify against high rank leaders . . . ."

Defendant's argument presumes the trial court's responsibility to examine the records extended beyond determining if they supported his stated reasons for requesting them: that Ripple might have been diagnosed with a mental disorder affecting her credibility, or that the records might show she was obsessed with defendant. Thus, he now claims he is entitled to relief because the trial court did not also comb through the records searching for anything defendant might possibly use to impeach Ripple, or any other prosecution witness, on some other, unmentioned theory. Defendant cites no authority for that proposition, but even were he correct, the uncertain, speculative nature of his claims falls far short of establishing the records contain matter that, if disclosed, would have been material to his defense.

Defendant's argument assumes Ripple was referring to pressure to testify against him in this trial, but if anything, the record suggests Ripple was *not* talking about this case. There is no evidence defendant was a "high rank leader" of any organization or that Ripple's asserted experience with the Aryan Brotherhood had anything to do with her testimony in this case. Ripple spoke at trial of her knowledge of many murders, some involving defendant and some involving other

51

persons. She also spoke of providing information about other murders to Detective Mike Proctor, who was not involved in the investigation of this case, and she mentioned she had been approached by a number of other agencies which presumably were interested in obtaining information from her. Defendant's argument also assumes Ripple's response to the psychologist concerning her outburst accurately reported what others told her at the meeting, but there is no compelling reason why that should be true. Defendant assumes, without supporting evidence, that Ripple's decision to testify against him was motivated by the promises and threats she claimed to have received. But Ripple expressed disdain for the promised benefit and further told the psychologist: "Well I stopped doing what men on the street wanted me to do before my arrest and I'm not going to do what those men want either." Defendant also assumes Ripple's reference to being transferred "down south" meant an offer of a permanent transfer to a preferred facility as opposed, for example, to a temporary transfer to put her in proximity to the court where she would testify. Finally, defendant assumes Ripple was indeed transferred "down south" as a result of her willingness to testify. But at most the record discloses Ripple was housed at CIW when called upon to testify in defendant's case. That Ripple had been offered a permanent transfer "down south" in return for her testimony in this case, or had been threatened with anything for failing to testify, is mere conjecture.

Just as the records do not show Ripple received a benefit for testifying, they also do not show defendant could have used them to establish Ripple and Tarpley were untruthful. Even had the records provided evidence persons attending the institutional classification committee meeting had made threats and promises connected to this case—and they do not—the records are not inconsistent with anything Ripple or Tarpley testified to at trial. Both witnesses explained that Ripple had been offered housing at CIW if she testified. Ripple testified a district

attorney investigator had told her that, if she agreed to testify, "he'd . . . put in a good word to have me transferred to [CIW for] the trial." Later she said the investigator had told her he thought he could have her moved to CIW for one year. The jury was also aware of Ripple's views of that offer; defense counsel read to the jury Ripple's written response: " 'You're offering me one year at CIW and the rest of my life in the hole.' " Detective Tarpley testified he told Ripple she would in all likelihood be called as a witness and might be housed at CIW, and an investigator told her that "if she had concerns about her safety, that we could possibly house her at CIW, so [she] would not be in the same facility as Mr. Abel." The psychiatric records do not show either witness was lying. Nor did nondisclosure of the psychiatric records prevent defendant from learning that some kind of offer to transfer Ripple to CIW had been made, so as to foreclose defendant from investigating the matter further.

Defendant argues he could have used the records to show Ripple had lied about her mental health because she did not report she had been diagnosed with antisocial personality disorder or psychopathy. But the records do not suggest Ripple was aware of the diagnosis or had any reason to know what the terms meant. Further, Ripple was not asked about her mental health; she was asked if she had been treated for mental health issues. The records do not show Ripple had received or was receiving any significant treatment related to her mental health or any treatment she might reasonably believe had any impact on her trial testimony. The records, therefore, did not provide a basis for impeaching Ripple's testimony about her treatment.

Defendant also argues the records showed Ripple lied about her criminal history, because when recounting that history to the jury she did not mention all the criminal acts and acts of violence she had reported to mental health personnel. But Ripple's testimony reflects she was not in the least unwilling to talk about her

53

criminal history, her use of weapons, or her violent lifestyle. That she did not mention every crime or violent act could not have affected the jury's view of her character or credibility.

For similar reasons, defendant is not entitled to relief on the theory the records would have enabled him to show Ripple was manipulative and had little conscience. Both points were clearly established by Ripple's trial testimony.

In sum, defendant's arguments that the records were material are premised on speculation and conjecture, not actual information contained in the records. Neither his right of confrontation nor his right to due process was violated by their nondisclosure.

### G. Other Claims of Evidentiary Error

Defendant contends the court should have sustained his objection that the prosecutor, when questioning Colleen Heuvelman, asked a leading question. The prosecutor was referring to a photographic lineup that included a photograph of Larry Jones. Heuvelman testified she told police investigators that Jones resembled the man she had seen. The prosecutor, after confirming Heuvelman had told the police that Jones's "eyes were close," asked, "Did you tell the police that there was a possibility of 20 to 40 percent?" Heuvelman said yes. The prosecutor then asked: "Did you ever identify [Jones] as being the person that you saw standing outside the bank?" Defendant objected that the prosecutor was leading the witness. The court overruled defendant's objection, and Heuvelman responded, "No, sir." Accepting for purposes of argument that the prosecutor's question was leading,[9] the evidence could not have prejudiced defendant, as other

---

[9] " 'A "leading question" is a question that suggests to the witness the answer that the examining party desires.' (Evid. Code, § 764.) Questions calling for a

*(footnote continued on next page)*

evidence firmly established defendant was the only person Heuvelman *ever* positively identified as the man she had seen.

Defendant also complains his ability to question Detective Tarpley was compromised because the court sustained objections that some of defense counsel's questions were leading. But nothing prevented counsel from eliciting the evidence he sought by rephrasing his questions. The court also did not err by overruling a defense objection on hearsay grounds after the prosecutor asked Lorraine Ripple if Deborah Lankford had said anything to Ripple about testifying. The evidence was admitted not to establish the truth of anything Lankford had said, but to bolster Ripple's credibility by showing she was testifying despite her fear her testimony would compromise her safety.

Finally, the record belies defendant's claims that the trial court's rulings had a chilling effect on the defense. The court's interruptions, quips, comments, and evidentiary rulings undoubtedly were somewhat irritating, but nothing in the record suggests defendant was thereby dissuaded or prevented from attacking the prosecution's evidence or from fully presenting his case.

### H. Cumulative Errors

Defendant argues that even if each asserted error, individually, does not require reversal, the errors, when considered cumulatively, undermined the integrity of the trial. We have found merit in only two of defendant's claims of error: that the trial court should not have admonished the jurors they could disregard an attorney's entire argument if they believed the attorney had lied to

---

*(footnote continued from previous page)*

'yes' or 'no' answer are not leading unless they are unduly suggestive under the circumstances." (*People v. Harris* (2008) 43 Cal.4th 1269, 1285.)

them, and that the court should not have interjected into the proceedings its personal knowledge of military-style coats.

We conclude that contrary to defendant's argument, there is no reasonable probability the identified errors had any effect on the outcome of the trial. This is so even if we consider the errors in conjunction with other evidence that we have found to have been admitted without error, such as threats made to Lorraine Ripple, defendant's sometime gang membership, his arrest for an unrelated crime, and his possession of weapons unrelated to Miller's murder. The case against defendant was not close. Defendant met the description of the murderer and was positively identified as that man by two witnesses who had taken great care to observe the gunman and who had provided a detailed description of him. Colleen Heuvelman rejected numerous pictures of other men, but positively identified defendant almost immediately upon seeing his photograph. Although Bettina Redondo at one time picked another man out of a photographic lineup and a third man out of a physical lineup, that she recanted each identification and expressed great concern about picking the wrong man added weight to her positive unrecanted identification of defendant's photograph in the only photographic lineup in which his photograph appeared and her assertion at trial that his photograph was a picture of the man she had seen in the bank's parking lot. Miller apparently was murdered by a man who knew Miller would be in the parking lot of Sunwest Bank on the morning of the murder, carrying a substantial amount of cash. Defendant, the man identified as the murderer by the witnesses, had been in Miller's market and had reason to know Miller withdrew substantial amounts of money from the bank on Friday mornings. Ripple, although far from a perfect witness, had been intimately involved in defendant's criminal activities; that he would confess to her he had killed Miller was not incredible.

We have reviewed the evidence in its entirety and conclude that, to the extent any of defendant's claims of error have merit, they neither individually nor cumulatively require reversal under either the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18, 24) or the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818, 836) standard.

## I. Instruction on Felony Murder and the Jury's Finding of Felony Murder

The information charged defendant with murder with malice aforethought in violation of Penal Code section 187, subdivision (a). But the jury was instructed with first degree felony murder and convicted defendant of that crime. Defendant, arguing that under our decision in *People v. Dillon* (1983) 34 Cal.3d 441, murder with malice aforethought and felony murder are separate offenses, contends the failure to charge him with felony murder deprived the court of jurisdiction to try him on that theory. He also claims allowing the jury to convict him of an uncharged crime violated his rights to due process, a jury determination of each element of the charged crime, adequate notice of the charges, and a fair and reliable guilt trial.

As defendant recognizes, we have rejected similar claims on many occasions. We have explained that the statement in the plurality opinion in *People v. Dillon*, *supra*, 34 Cal.3d at page 476, footnote 23, that felony murder and murder with express or implied malice "are not the 'same' crimes," means only that the two forms of murder have different elements even though there is but a single statutory offense of murder. (*People v. Moore* (2011) 51 Cal.4th 386, 412-413; *People v. Carpenter* (1997) 15 Cal.4th 312, 394-395; *People v. Pride* (1992) 3 Cal.4th 195, 249.) We have further explained that an accusatory pleading charging murder need not specify the theory of murder upon which the prosecution intends to rely. (*People v. Hughes* (2002) 27 Cal.4th 287, 369.) We

57

thus have consistently rejected the argument that a defendant charged only with a violation of Penal Code section 187, subdivision (a) may not be convicted of first degree murder, including first degree felony murder. (E.g., *People v. Morgan* (2007) 42 Cal.4th 593, 771-772; *Hughes*, at pp. 369-370.)

A pleading referring only to Penal Code section 187, subdivision (a) provides adequate notice that the defendant might be convicted of first degree murder on a felony-murder theory. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1131.) Further, a special circumstance allegation that a defendant murdered the victim during the course of a robbery provides more than adequate notice that the prosecution will be pursuing a felony-murder theory of first degree murder. (*People v. Moore*, *supra*, 51 Cal.4th at p. 413.) Here, the information filed against defendant alleged the special circumstance of murder during the commission of a robbery. (Pen. Code, § 190.2, subd. (a)(17).) In addition, " 'generally the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing.' " (*People v. Hughes*, *supra*, 27 Cal.4th at pp. 369-370.) In this case, the prosecutor at the preliminary hearing established probable cause that the murder occurred during the commission of a robbery, and the case was tried on the theory that the murder was committed during the course of a robbery. Defendant thus had ample notice the prosecution was proceeding on a theory of felony murder.

Defendant cites the admonition in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 476 that " 'any fact (other than [a] prior conviction) that increases the maximum penalty for a crime *must be charged* in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' " (Italics added.) But *Apprendi* and its progeny address "the Sixth Amendment right to a jury determination of facts used in sentencing beyond the elements of the charged offenses." (*People v. Moore*, *supra*, 51 Cal.4th at p. 413.) These cases do not create new notice

58

requirements for alternative *theories* of a substantive offense such as a theory of first degree murder.

### III. PENALTY PHASE ISSUES

#### A. Effect of the Murder upon Family Members

"Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under [Penal Code] section 190.3, factor (a).)" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056-1057.) The United States Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. (*People v. Burney* (2009) 47 Cal.4th 203, 258, citing *Payne v. Tennessee* (1991) 501 U.S. 808, 825.) The testimony of Miller's parents about their own emotions following their son's death and the effect it had on their lives did not exceed acceptable limits.

Defendant complains, however, that America Miller impermissibly asserted the murder caused the death of her other son, Bobby. A family member may properly testify about the effect of a murder on another family member, and it is not required that the other family member had been present at the scene during or immediately after the crime. (See *People v. Jurado* (2006) 38 Cal.4th 72, 132 [victim's mother-in-law properly allowed to testify about the impact of the murder on the victim's daughter, and the victim's parents properly allowed to testify about the impact of the murder on their other children and grandchild]; *People v. Wilson* (2005) 36 Cal.4th 309, 357 [proper for the victim's sister to speak about the effect of the crime on the victim's daughters and on her own daughter].) Nevertheless, unless supported, a witness's statements that the defendant's crime caused or hastened the death of a third person are improper speculation. (*People v. Brady* (2010) 50 Cal.4th 547, 577-578 [improper for the victim's sister to testify that

their mother had given up on life six months after the murder]; *People v. Carrington* (2009) 47 Cal.4th 145, 197 [trial court correctly told a witness it was improper to speculate that the victim's death may have contributed to the death of the victim's mother].)  But here, America Miller's statement, even if improper speculation, could not have prejudiced defendant.  Immediately after America Miller spoke about Bobby's death, the prosecutor asked if Bobby had died of heart problems and, after receiving an affirmative response, moved on to other topics.  The prosecutor referred to the statement during closing argument, telling the jurors that even if America Miller believed the murder was a factor in the death of her second son, there was no evidence supporting such a belief and they should not consider the statement except as it showed the impact of the murder on her.[10]  That the jury would have understood America Miller's statement to be an assertion of medical fact is highly improbable, particularly after the prosecutor's careful explanation.  (*Brady*, at p. 578.)

Further, in light of the nature of the crime and the other aggravating factors, including defendant's criminal history, there is no reasonable possibility America

---

[10]    The prosecutor explained:  "I know Ms. Miller said something about her son Bob, Bob having heart problems.  Ladies and Gentlemen . . . we're not suggesting in no way, shape, or form, that John Abel is responsible for the death of her other son.  I mean, this is a mother, obviously, in her mind she feels that this somehow impacted her son's heart.  But we're not asking you to hold Mr. Abel responsible for the heart problems of Bob, Bobby Miller, who eventually died. [¶] But in her own mind—this is, again, the impact of this crime on this victim and the victim's family.  In her mind, the way she's dealing with this is she feels the killing of Armando Miller is such a heartbroken event to her other son, who he was close to, that this is what caused his illness.  [¶] There's no evidence of that, there's no proof of that.  So I ask you not to consider that the death of Bobby Miller had anything to do with this incident.  That is just her impression and it's part of her victim impact, but there's no proof of that."

Miller's statement affected the penalty verdict. (See *People v. Brown* (1988) 46 Cal.3d 432, 447-448.)

## B. Denial of Defendant's Automatic Application for Modification of the Death Verdict

### 1. *Court's consideration of additional victim impact evidence*

Before ruling on defendant's automatic application for modification of the verdict of death (Pen. Code, § 190.4, subd. (e)), the court permitted Miller's fiancée, Holly Daniels, and his mother, America Miller, to make brief statements. Daniels told the court how Miller's death had affected her and their daughter. America Miller said her faith allowed her to forgive defendant, and admonished defendant to accept God. Defendant contends the judgment of death must be vacated because the court improperly heard victim impact statements that had not been considered by the jury in fixing the penalty at death.

In ruling on a defendant's application for modification of a verdict under Penal Code section 190.4, subdivision (e), the trial court " 'must independently reweigh the evidence of aggravating and mitigating factors presented at trial and determine whether, in its independent judgment, the evidence supports the death verdict.' " (*People v. Carrington*, *supra*, 47 Cal.4th at p. 201.) A trial court ruling on the application therefore should not consider evidence, including statements from the victim's relatives, that was not presented to the jury during the penalty phase of the trial. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1184.) Here, although the court allowed Miller's fiancée and mother to speak, it did so only after expressing agreement with the jury's finding that the circumstances in aggravation were so substantial in comparison with the mitigating circumstances that the penalty of death was warranted. The statements therefore did not factor into the court's decision to deny the motion. Further, defendant did not object, thereby forfeiting his claim. (See *People v. Rogers* (2006) 39 Cal.4th 826, 907.)

61

## 2. *Suggestion defendant was required to establish mitigating factors "beyond a reasonable doubt"*

Defendant, citing the trial court's statement that it found no "factors in mitigation proven beyond a reasonable doubt," contends the court misunderstood the standard by which it was to review the jury's determination of penalty, requiring reversal of the judgment of death. Defendant is correct that because the sentencing function is inherently moral and normative, not functional, it is not susceptible to a burden of proof quantification; neither the prosecution nor the defense has the burden of proof during the penalty phase. (*People v. Moore*, *supra*, 51 Cal.4th at p. 415; *People v. Welch* (1999) 20 Cal.4th 701, 767.) Thus, it would be error to deny a motion for modification because the defendant failed to prove the existence of mitigating factors beyond a reasonable doubt. But that is not what happened here.

The trial court opened the proceedings by explaining it was required to review the evidence, taking into account and being guided by the aggravating and mitigating factors referred to in Penal Code section 190.3, to make a determination as to whether the jury's findings and verdicts were contrary to law or to the evidence presented. (See Pen. Code, § 190.4, subd. (e).) The court stated it agreed with the jury's findings that the aggravating factors were so substantial in comparison with the mitigating factors that the penalty of death was warranted, and it found the jury had correctly determined that the robbery-murder special circumstance was true. The court explained that after conducting the requisite review of the evidence, it found the evidence of defendant's guilt and the special circumstances to be overwhelming; the victim's family had suffered as a result of the crime; defendant had suffered numerous prior convictions, "most of which were armed robbery of homes, businesses and banks"; and at least 20 separate robbery victims had testified about the violent crimes defendant had committed

62

against them.  Defendant had offered no factors in mitigation, but the court, referring to the factors listed in Penal Code section 190.3, nonetheless observed that defendant had not committed murder while acting under extreme duress or any mental or emotional disturbance or defect; defendant's age at the time of the murder, 47, was not a mitigating factor; the victim had not participated in defendant's homicidal conduct and had not consented to the conduct; there were no circumstances defendant might reasonably have believed to have provided a moral justification or extenuation for his conduct; there were no circumstances that might extenuate the gravity of the crime; and defendant's capacity to appreciate the criminality of his conduct or the requirements of the law had not been in any way impaired as the result of mental disease, defect, or the effect of any intoxicants or drugs or a combination thereof.

The record therefore reflects that the court thoroughly understood its statutory obligation and carefully analyzed the evidence in light of that obligation. When considered in context, the court's further statement that it found beyond a reasonable doubt that defendant was guilty and there were aggravating factors and no mitigating factors appears to have been made to emphasize the absence of *any* evidence of mitigating factors, not to suggest defendant was required to prove their presence beyond a reasonable doubt.  But even if the court misstated the law, the misstatement seems to have been no more than a slip of the tongue.  In *People v. Mayfield* (1993) 5 Cal.4th 142, 196, we rejected a claim of error after recognizing that the trial court had correctly applied the law even if it had not correctly and consistently pronounced it.  We reject defendant's claim here for the same reason.

We conclude the trial court carefully and conscientiously performed its duty under Penal Code section 190.4.  (See *People v. Smith* (2003) 30 Cal.4th 581, 640.)

### C. Other Death Penalty Claims

Our past decisions have repeatedly addressed and rejected the other challenges defendant makes to the death penalty. He states no persuasive reason why we should reconsider settled law.

Thus, we continue to hold that California's death penalty law does not violate the Eighth Amendment to the United States Constitution or international law (*People v. Moore*, *supra*, 51 Cal.4th at p. 417; *People v. Brasure* (2008) 42 Cal.4th 1037, 1071-1072), including article VII of the International Covenant on Civil and Political Rights (Dec. 16, 1966) (*People v. Lomax* (2010) 49 Cal.4th 530, 595; *People v. Butler* (2009) 46 Cal.4th 847, 885).

California's death penalty statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow*, *supra*, 30 Cal.4th at p. 126; accord, *People v. Moore*, *supra*, 51 Cal.4th at p. 415; *People v. Bell* (2007) 40 Cal.4th 582, 620.)

The United States Supreme Court's decisions in *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, and its progeny, do not establish a Sixth Amendment right to determination of particular aggravating factors, or a finding that aggravation outweighs mitigation beyond a reasonable doubt or by a unanimous jury. (*People v. Moore*, *supra*, 51 Cal.4th at pp. 415-416; *People v. Taylor* (2009) 47 Cal.4th 850, 899.)

A defendant's Sixth, Eighth, and Fourteenth Amendment rights do not require an instruction that mitigating factors need not be found by a unanimous jury or by any particular standard of proof. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 594; *People v. Ervine* (2009) 47 Cal.4th 745, 810.) Moreover, here the jury was

specially instructed: "There is no requirement that all jurors unanimously agree on any matter offered in mitigation or aggravation. Each juror makes an individual evaluation of each fact or circumstance in aggravation or mitigation of penalty. Each juror should weigh and consider such matters regardless of whether or not they are accepted by other jurors."

The inclusion of the phrase "so substantial" in CALJIC No. 8.88, used here (jurors "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole"), does not render the instruction impermissibly vague. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 595; *People v. Moon* (2005) 37 Cal.4th 1, 43.) The term "warrants" in the instruction is not overbroad and adequately conveys that the central inquiry is whether death is "appropriate." (*People v. Griffin* (2004) 33 Cal.4th 536, 593; *People v. Breaux* (1991) 1 Cal.4th 281, 315-316.)

CALJIC No. 8.88 is not unconstitutional for failing to inform the jury it must return a sentence of life without the possibility of parole if it determines the circumstances in mitigation outweighed those in aggravation. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 595; *People v. Moon*, *supra*, 37 Cal.4th at p. 42.) The instruction is not defective for failing to recite that neither party in a capital case bears the burden of persuading the jury of the appropriateness or inappropriateness of the death penalty. We have long held that because the assessment of aggravating and mitigating circumstances required of penalty jurors is inherently normative, not factual, it is not susceptible to a burden of proof quantification. (*People v. Moore*, *supra*, 51 Cal.4th at p. 415; *People v. Bell*, *supra*, 40 Cal.4th at p. 620.)

The failure to require intercase proportionality review does not render the death penalty law unconstitutional. (*People v. Moore*, *supra*, 51 Cal.4th at p. 417;

*People v. Lomax*, *supra*, 49 Cal.4th at p. 595; *People v. Hamilton* (2009) 45 Cal.4th 863, 960.)

### D. Cumulative Error

Defendant's final complaint is that even if reversal is not required by the errors occurring in his trial when considered individually, it is required by their cumulative effect, which he claims undermines any confidence in the integrity of the proceedings. We previously concluded the outcome of the trial was unaffected by the only errors occurring during the guilt phase. Finding no additional errors during the penalty phase, we reject defendant's complaint for the reasons we have already stated.

## IV. DISPOSITION

We affirm the judgment.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Abel

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S064733
**Date Filed:** March 19, 2012

_____

**Court:** Superior
**County:** Orange
**Judge:** Robert R. Fitzgerald


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Kate Johnston and Mary K. McComb, Deputy State Public Defenders for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne S. Denault and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mary K. McComb
Deputy State Public Defender
801 K Street
Sacramento, CA  95814
(916) 322-2969

James D. Dutton
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2212