Filed 9/4/14  P. v. Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048107 |
| v. | (Super. Ct. No. 11CF0585) |
| EFREN GONZALEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lise S. Jacobson and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Efren Gonzalez guilty of lewd act upon a child under 14 in violation of Penal Code[1] section 288, subdivision (a), and found it to be true that all factors necessary to extend the statute of limitations under Penal Code section 803, subdivision (f) have been proven by clear and convincing evidence, "namely, that: (1) On February 28, 2011, [T.]N. reported that he was the victim of a violation of Penal Code section 288(a) to law enforcement, namely Investigator Damon Tucker of the Orange County District Attorney's Office; (2) Prior to reporting the alleged crime to Investigator Tucker on February 28, 2011, T.N. had not previously reported the alleged crime to a law enforcement agency; (3) Within a year of T.N. reporting the alleged crime to Investigator Damon Tucker, a criminal complaint was filed in this case; (4) The alleged crime occurred before T.N. turned 18 years old; (5) The alleged crime involved substantial sexual conduct; (6) There is independent evidence that corroborates [T.]N.'s allegation; and (7) That all other statute of limitations periods have expired."

At a bifurcated proceeding, the court found defendant guilty of committing a prior act of lewd and lascivious conduct with a minor, found it to be true defendant had two priors under the "Three Strikes" law. (§§ 667, subds. (d), (e)(2)(A), 1170.12, subds. (b), (c)(2)(A), and that defendant had one serious felony prior. (§ 667, subd. (a).) The court also found it to be true that defendant is a habitual offender within the meaning of section 667.71, subdivision (a). The court sentenced defendant to an indeterminate term of 75 years to live, plus a five-year determinate term.

On appeal, defendant contends the trial court erred when it denied his motion to dismiss the case "due to the 15-year precharging delay." He also argues the trial court erred by failing to exercise its discretion "to strike at least one strike pursuant

---

[1] All further statutory references are to the Penal Code.

2

to *Romero.*[2]  Defendant's last contention of error concerns an alleged illegal restitution and parole revocation fine.  We affirm.

I

FACTS

*1992*

Ruben L., who is not a victim in this case, was born in late 1981.  In 1992, he knew defendant.  During the 2012 trial of the instant matter, Ruben testified defendant "would come around our apartment . . . our apartment complex and that's how I met him."  Defendant met Ruben's parents at some point.

Ruben said there had been several incidents of inappropriate touching.  He described one that occurred while Ruben was sitting on top of a washer or dryer in the laundry room.  He said defendant "came up to me between my legs and kind of touching me and then he tried to — when he tried to kiss me, that's when I kind of pushed him away and told him to stop."  He said the place where defendant touched him was "around my butt."  Ruben turned his head, and defendant missed his lips, but kissed Ruben on his face.  Defendant offered Ruben $5 "not to tell anybody."

He related one other incident he remembered about defendant that happened when "me and all the guys" were in the pool.  "He grabbed me from my groin and kind of my chest and picked me up and kind of threw me across the water."

Later, Ruben told a teacher about defendant's conduct.  After that, the police got involved.

*1994, 1995*

The victim, T.N. was born in late 1984.  When he testified in 2012, he was 27 years old.  T.N. met defendant in the laundry room of the apartment complex where

---

[2]  *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

3

they both lived when he was nine or 10 years old. Defendant went to T.N.'s parents to inform them he was putting together a boys' soccer team. T.N. joined the team, which was composed of other boys who were about the same age.

T.N. described the first incident: "He was doing laundry in the laundromat room. We were talking about the team and I can remember him saying if I ever kissed someone, a girl. I was kind of shocked because I never, you know, thought about that, you know. I was growing up. I was a nine or ten year old. I said no. [¶] He kind of tells me, 'You should practice with a fruit,' you know. And he kissed me. It kind of felt awkward. That's one of the ones that I can remember as starting." T.N. explained defendant kissed him on the mouth, using his tongue.

T.N. described how defendant's conduct escalated: "Well, it started by touching, you know, private areas. Getting more, you know, more into sexual stuff with private areas, kissing more intimately, stuff like that." Defendant "kept telling [T.N.] to grab his penis on occasions, masturbate him, stuff like that." These contacts occurred both on T.N.'s bare skin and through his clothing. At times, defendant ejaculated. Defendant at times would push T.N.'s head toward defendant's penis to "try to get [T.N.] to suck his penis."

According to T.N., defendant "would treat me good. I mean, he would buy me stuff, you know, take me on trips to Disneyland, Big Bear with family, obviously he would be nice." Reflecting back on being on the soccer team during those days, T.N. said he doesn't think, that based on the merits, he deserved as much playing time as he got. Defendant developed a relationship with the T.N.'s parents as well; he came to the family home, and drank and played cards with T.N.'s parents.

The prosecutor asked the following question: "You told us earlier about times where he would have you masturbate his bare penis and have you put your mouth on his penis?" T.N. said "uh-huh," and said that happened three times. The places where

4

these incidents occurred were, "[h]is brother's house in the apartment complex where he lived and in the car."

Regarding an occasion when T.N. went to an Immigration and Natural Service (INS) office with defendant, T.N. described what happened: "He told me he was going to have to get some stuff and check into the office and I didn't know what the office was for. We waited in the waiting room and they called him in. Next thing I know he's in handcuffs and all that stuff, so I'm there crying, you know, and just being hysterical. I mean, my parents were not there, it was just him I was with. And knowing I was by myself, I just started, you know, panicking." Before T.N.'s father picked him up from the office, T.N. did have some contact with federal agents at the INS office. The agents asked T.N. "if he did anything like that to me," and T.N. said "no." T.N. never saw defendant again.

At trial, William Wallace, who is currently employed with Homeland Security Investigations, testified. He said that on August 25, 1995, he was a special agent with the INS at the Westminster, California office. At that time, he was informed about defendant that the "immigration status showed that he had been arrested in Los Angeles." Wallace determined he had "a couple of arrests in his background" for child molestation, and that there was a parole warrant for his arrest.

While defendant was in Wallace's office, defendant said he would like to talk to the people who had come to the office with him. Defendant provided Wallace with T.N.'s name, and said T.N.s father drove them to the INS office, and dropped them off while he went to buy groceries.

Wallace had T.N. paged to the front counter, and at trial Wallace described the person who responded to the page: "It was a small Latino kid that was about 10 years old." Wallace testified he did not interview T.N.

5

Afterward, Wallace called the Orange County Child Abuse Registry. He told them they had taken defendant into custody and that "he had a couple of photos with him of soccer teams."

*2011*

In January and February of 2011, Damon Tucker was assigned to the sexual assault unit at the Orange County District Attorney's Office. Tucker was informed that defendant was about to be released from prison, and he was asked to assist in possibly locating other victims. In the performance of that duty, Tucker came upon an INS memo authored by Wallace. Using an available computer database, Tucker located T.N.'s address.

In February 28, 2011, Tucker went to T.N.'s home. At that time, T.N. told the investigator of the touching, masturbation and oral sex incidents. Before that time, T.N. never told any police officers what happened.

The following questions were asked by the prosecutor and answered by the victim:

"Q: So you didn't tell anybody at INS and then, you didn't tell anybody from law enforcement all the way up until the time when Investigator Tucker came to your house?

"A: That's right.

"Q: Can you tell us why it is over the years that you never went to the police or anybody else about what happened?

"A: Well, as you know, it's a very hard situation, you know, growing up, understanding what he was doing was wrong and being in school calling you names, gay, faggot. I kind of put it in the past, you know. Kind of made a gap for that and put it behind me. I moved forward with my life, you know. [¶] My parents always asked me 'that was weird, you know, that he would buy all that stuff, he would do this.' And I

6

would be like, 'I don't know. He just liked me.' But deep down I never came up open to anybody. [¶] The only person I came up opened to was my wife and that's after having kids. It does take a hit to me knowing that I have kids and the thing that happened to me."

A felony complaint was filed by the People on March 7, 2011.

*Pretrial Motion to Dismiss*

The information was filed on January 5, 2012, and amended on February 24, 2012, alleging that between December 1, 1994 and August 25, 1995, defendant committed a lewd and lascivious act upon the victim. Defendant moved to dismiss the information for denial of due process and speedy trial. For purposes of the motion, the lawyers on both sides stipulated to the admission of certain facts and documents:

1) That Wallace's August 25, 1995 memorandum "accurately reflects his actions and observations of that date." Wallace's memorandum includes: "[T.N.]'s father arrived and stated that he had been delivering groceries. He was apprised of the situation and told that other agencies would be contacting him regarding his son's relations with GONZALEZ. SSA Salacup asked [T.N.'s father] if he was aware of GONZALEZ's previous history and he stated that he knew that GONZALEZ had some problems before but was not aware of them. He stated that he and his wife had noticed a change in their son's behavior but did not understand the change. He stated that his son spent a lot of time alone with GONZALEZ because they trusted him. He stated that he left [T.N.] with GONZALEZ this morning telling them he would return later to pick them up." Also in the memorandum is the following: "I contacted Debbie Sherwood of the Child Abuse Registry who took a report regarding the events and circumstances regarding GONZALEZ and his relationship with T.N. She stated that it appeared that GONZALEZ was molesting children again and stated that she would be forwarding a report to the Santa Ana Police Department for an immediate investigation."

7

2) The August 25, 1995, Orange County Social Services Agency Child Abuse Report, that was forwarded to the Santa Ana and Garden Grove Police Departments.

3) Defendant's parole records prepared on or about September 3, 1995. A report in those records states: "It would appear that the parolee in actuality has numerous counts of violation of a special condition as he was seen pictured with his teams of soccer player[s]; all of which were minor children in addition to his other violations. The parolee continues to be a very dangerous person and has not abided by parole since his last release from a violation. In view of his involvement in the instant offenses it is recommended that he be returned to custody for a maximum amount of time as he continues to be a predatory individual."

4) "Defendant Efren Gonzalez was arrested on or about August 25, 1995, at the office of the INS. Defendant was then turned over to the custody of the [California Department of Correction] CDC and faced violation, and was adjudicated in violation . . . Defendant remained in Orange County Jail until he was adjudicated guilty on February 18, 2000, and then sentenced to 172 months in state prison with credits to that date totaling approximately one year. That sentence was completed on January 19, 2011."

5) On January 18, 2011, the CDC obtained a 45-day hold to complete evaluation of Defendant as a "Sexually Violent Predator" . . . . On March 1, 2011, the People filed a civil petition . . . to have Defendant committed as an SVP . . . . The People thereafter filed this case on March 7, 2011.

6) Both the victim and his parents indicated that no police officers contacted them until they were contacted on February 28, 2011.

At the hearing on the motion to dismiss, an officer from the Garden Grove Police Department testified the department's records revealed that defendant registered as a sex offender in 1993. Defendant's counsel argued at the hearing: ". . . And then the last thing I would say is when we're looking at the prejudice, I believe that all we need to

8

show is any small prejudice, and then it would go to whether the delay was unreasonable, and I don't know what the reasonable amount is, but 16 years with absolutely no new developments, zero, zero. It went back to something that was prepared the day of the arrest. The date on the memo is the same day he was arrested. It was prepared the same day. It's been sitting there the whole time and there has been no justification whatsoever for the delay. There is absolutely zero. . . . They had everything they needed to go out to the house, talk to the guy, 20-minute conversation, and file the case. So whose fault is that? Well, that's going to be law enforcement 100 percent." The motion to dismiss was denied.

*Posttrial Motion to Strike*

On March 1, 2013, the court heard defendant's *Romero* [*People v. Superior Court* (*Romero*), *supra*, 13 Cal.4th 497] motion. In ruling on defendant's motion, the court stated: "When the court looks at this case, yes, yes, the actual sex acts are not among the worst. But that's like saying a particular murder is not as bad as the Night Stalker or something. I'm not sure what that proves. [¶] The probation report talks about aggravating and mitigating factors. Callous and cruel, yes. Victim vulnerable and young, yes. Planned, absolutely. Even starting with the soccer team. A violation of trust, yes. One misdemeanor and five felony prior convictions, yes. Prior state prison commitment, yes. On parole when this occurred, yes. Three psychologists saying he is a confirmed pedophile, yes. SARATSO[3]—that's an acronym saying he is high risk — yes. He not only qualifies under the One Strike law, but under the Habitual Criminal law 667.71, yes. [¶] [T.]N., though we may look as criminal laws that these acts aren't so bad, compared to what we see sometimes, [T.]N. was affected. Counsel reminded me of the touching thing where [it] is awkward for him to bathe his own children. [¶] So, can

---

[3]         State Authorized Risk Assessment Tool for Sex Offenders.

9

the court make a finding that the sentence under the Three Strikes law is cruel and unusual? Well, it's significant that though that's been on the books for quite some time, there's no case law as far as I know, no case finding that to be cruel and unusual. [¶] Now, it's true you have not only the One Strike law here but it's tripled because of the three strikes. But the court can't find that to be cruel and unusual, despite the good briefing by the defense. [¶] The defendant is not outside the spirit of Three Strikes law. [¶] And the court would decline to strike the strikes."

II

DISCUSSION

*Motion to Dismiss*

Defendant contends the trial court erred when it denied his motion to dismiss the case "due to the 15-year precharging delay." He argues: "During those intervening years, [defendant] completed two prison terms. The prosecution mounted an investigation only when [defendant] was due to be paroled in 2011 on his most recent prior case. Then, [defendant] was detained for evaluation for potential civil commitment under the SVP law. . . . In the course of that evaluation, the prosecution tracked down [T.N.], who then claimed [defendant] had molested him years ago, and this criminal prosecution was filed days later."

"Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date of a report to a California law enforcement agency by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in Section 261, 286, 288, 288a, 288.5, or 289, or Section 289.5 . . . ." (§ 803, subd. (f)(1).)

"A defendant's state and federal constitutional speedy trial rights [citation] do not attach before the defendant is arrested or a charging document has been filed. [Citation.] Nonetheless, a defendant is not without recourse if a delay in filing charges is prejudicial and unjustified. The statute of limitations is usually considered the primary

guarantee against overly stale criminal charges [citation], but the right of due process provides additional protection, safeguarding a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.  [Citation.]"  (*People v. Abel* (2012) 53 Cal.4th 891, 908.)

"A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time.  [Citation.]"  (*People v. Abel*, *supra*, 53 Cal.4th at p. 908.)  Prejudice to a defendant from precharging delay is not presumed.  (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250.)  Although "under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. . . ."  (*Id.* at p. 1255.)  "If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation."  (*Id.* at p. 1256.)  If the defendant fails to meet the burden of showing prejudice, there is no need to determine whether the delay was justified.  (*Serna v. Superior Court* (1985) 40 Cal.3d. 239, 249.)

"Prejudice may be shown by '"loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memories attributable to the delay."' [Citations.]"  (*People v. Cowan* (2010) 50 Cal.4th 401, 430.)  "We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay . . . ."  (*Id.* at p. 431.)

Here defendant argues prejudice because the defense was unable to locate the persons from Orange County Social Services Agency or the two police departments who were assigned the investigation in 1995.  Without those individuals, defendant argues, he has been unable to challenge T.N. and his family about their present position they were not contacted in 1995.  Defendant also argues T.N.'s dulled memory about

11

when the acts occurred has prevented him from contacting witnesses who might have been available earlier. He also points out the INS took some soccer photos from defendant in 1995, and as a result, he has been unable to track down other boys on the team or their parents to use for impeachment purposes or character testimony.

With regard to the Disneyland trip, defendant points out that during his testimony, T.N. said he could not recall who else went with them. Without the benefit of T.N.'s memory, defendant now argues, he was unable to develop an argument that defendant did not give T.N. "special treatment as a means of grooming him as a victim."

It would be difficult for this court to conclude there was no negligence here. Representatives of the federal government, the County of Orange, the City of Santa Ana and the City of Garden Grove were given information in 1995 warranting further investigation about child molestation. We will never know whether or not each agency thought another agency was performing an investigation. Nonetheless, while defendant argues a litany of possible consequences, he has not pointed us to any witness whose memory was dulled to his detriment. Both Ruben L. and T.N. had hazy memories regarding some details, but we don't find any prejudice to defendant as a result. T.N. testified that it was not until he reached adulthood and had children of his own, that he was ready to confide his secret to his wife. In fact, when he was specifically asked about molestation by Wallace in 1995, he denied it. Thus, there is a strong indication he would not have revealed the true facts to detectives had they investigated the matter in 1995. Wallace did not remember much, but his detailed memorandum was kept. Defendant's arguments about alibi evidence are mere speculation. Soccer photographs, showing defendant with a team of little boys, would more likely than not have undermined, rather than assisted, his defense.

Under the law, we cannot presume prejudice. Under the circumstances we find in this record, we cannot conclude defendant was actually prejudiced by the lengthy

12

prefiling delay. Thus, we do not conclude the trial court abused its discretion in denying defendant's motion to dismiss.

*Romero Motion*

Defendant next contends the trial court erred by failing to exercise its discretion to strike at least one strike pursuant to *People v. Superior Court* (*Romero*), *supra*, 13 Cal.4th 497.

The United States Supreme Court stated California has a "'valid interest in deterring and segregating habitual criminals'" such as defendant. (*Ewing v. California* (2003) 538 U.S. 11, 25.) "As under the federal standard, a defendant's history of recidivism, which is part of the nature of the offense and the offender, justifies harsh punishment. [Citations.]" (*People v. Meeks* (2004) 123 Cal.App.4th 695, 709.)

Section 1385, subdivision (a) states in pertinent part, "The judge or magistrate may, either of his or her own motion or upon application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." While the statute allows for a motion to be made only by the prosecutor or on the court's own motion, a defendant may "invite" the court to exercise its discretion to strike a prior felony. The court's ruling on such a motion is reviewable for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374-375.) A trial court abuses its discretion only if its ruling is "so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

The Three Strikes scheme is intended to limit courts' discretion in sentencing repeat offenders. There exists no discretionary sentencing choice, unless the sentencing court determines that an exception should be made because defendant is deemed to fall outside the spirit of the Three Strikes law. This analysis includes considering remoteness and the nonviolent nature of prior offenses. (See *People v. Bishop* (1997) 56 Cal.App.4th 1245.) When deciding whether to strike a prior, "weight

13

must be accorded to factors intrinsic to the scheme, such as the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of the his background, character, and prospects. [Citation.]" (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

State legislatures enacting Three Strikes laws made a deliberate policy choice that individuals who have repeatedly engaged in serious or violent criminal behavior, and whose conduct has not been deterred by more conventional punishment approaches, must be isolated from society to protect the public safety. (*Ewing v. California*, *supra*, 538 U.S. at p. 24.) "In imposing a three strikes sentence, the State's interest is not merely punishing the offense of conviction, or the 'triggering' offense: 'It is in addition the interest . . . in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law.' [Citations.]" (*Id.* at p. 29.)

Here the court very carefully and meticulously analyzed the state of affairs surrounding defendant's present crime and past crimes prior to denying his motion to strike. Under the circumstances we find in this record, we cannot conclude the court abused its discretion.

*Restitution/Parole Revocation Order*

Lastly, defendant contends the court violated his ex post facto rights when it imposed a restitution fine and parole revocation fine in the amount of $280 because his crime occurred before the change in the law. He requests that we reduce the amount to $200.

In the instant matter, the trial court stated: "The court would impose a $280 restitution fine. If the defendant is ever released on parole and violates that parole, another $280." Defendant waived the right to be present at any future restitution hearing.

14

At the time of the offenses, the minimum restitution and parole revocation fines were $200.  On January 1, 2012, the statutory minimum restitution fine was increased to $240, and on January 1, 2013, the minimum restitution fine was increased to $280.  (§ 1202.4, subd. (b)(1).)

As defendant cites us to nothing in the record to support his implied contention the court intended to impose the *minimum* fine permitted by law, we deem this argument waived.  (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 109.)

III

DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

15